**John Roy HARPER, II, et al.**

v.

**Edward H. LEVI, Attorney General of the United States, et al.,**
**Appellants (two cases).**

**Nos. 73–1766, 73–2035.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 12, 1974.

Decided July 24, 1975.

---

Gerald W. Jones, Atty., Dept. of Justice, of the bar of the United States District Court for the District of Columbia, pro hac vice, with whom Harold H. Tyler, Jr., U. S. Atty. at the time the brief was filed, was on the brief, for appellants.

J. Roger Wollenberg, Washington, D. C., with whom Max O. Truitt, Jr., Timothy N. Black, William T. Lake, and Armand Derfner, Washington, D. C., were on the brief, for appellees. Max O. Truitt, Jr., Washington, D. C., also entered an appearance for appellees.

Before BAZELON, *Chief Judge,* and ROBINSON and MacKINNON, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* SPOTTSWOOD W. ROBINSON, III.

Dissenting opinion filed by *Circuit Judge* MacKINNON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This case presents issues, never before tendered to this court, concerning executive enforcement of Section 5 of the Voting Rights Act of 1965.[1] Appellees[2] filed a class action in the District Court seeking review, pursuant to Section 10 of the Administrative Procedure Act,[3] of a

---

1. Pub.L.No.89–110, § 5, 79 Stat. 439 (1965) (amended by Pub.L.No.91–285, § 5, 84 Stat. 315 (1970)), as amended, 42 U.S.C. § 1973c (1970), quoted *infra* note 12.

2. The appellees, who were the named plaintiffs in the District Court, are two black registered

South Carolina voters residing in counties affected by the reapportionment related to this appeal.

3. 5 U.S.C. §§ 701–706 (1970).

decision by the then Attorney General to forego objection under Section 5 to a proposed reapportionment of the South Carolina Senate. The Attorney General had independently concluded that the reapportionment was proscribed by Section 5, but nevertheless had "deferred" to the countervailing decision of a federal district court in South Carolina[4] and had declined to lodge an objection. In the action germinating this appeal, the District Court held that the Attorney General had not fulfilled his statutory obligation and ordered him to reconsider without regard to the prior court decision.[5] The Attorney General subsequently interposed an objection to the reapportionment, thereby preventing its effectuation.[6]

Appellants[7] argue that the District Court was without jurisdiction,[8] that the Attorney General's determinations under Section 5 are not reviewable,[9] and that an objection was precluded in this instance by the antecedent judicial decision.[10] We find none of these contentions persuasive. For reasons articulated in the discussion that follows, we affirm the District Court's action.

## I. PROCEDURAL HISTORY

States and political subdivisions embraced by Section 4 of the Voting Rights Act[11] are forbidden by Section 5 from instituting any change in voting qualifications or procedures without first obtaining a judgment in the District Court for the District of Columbia declaring that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color."[12] Alternative-

---

4. Twiggs v. West, Civ.No. 71–1106 (D.S.C. May 23, 1972) (unreported).

5. Harper v. Kleindienst, 362 F.Supp. 742 (D.D.C.1973). The proceedings in the District Court are more completely summarized below. See text *infra* at notes 39–44.

6. See text *infra* at notes 11–16.

7. Appellants, the defendants in the District Court, are the Attorney General of the United States and the Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice, to whom the Attorney General has delegated the responsibility of administering § 5.

8. See Part II, *infra*.

9. See Part III, *infra*.

10. See Part IV, *infra*.

11. As amended, 42 U.S.C. § 1973b (1970). In relevant part § 4 provides:

 (b) The provisions of subsection (a) of this section shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964. On and after August 6, 1970, in addition to any State or political subdivision of a State determined to be subject to subsection (a) of this section pursuant to the previous sentence, the provi-

sions of subsection (a) of this section shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1968, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968.

 A determination or certification of the Attorney General or of the Director of the Census under this section or under section 1973d or 1973k of this title shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

 The interrelationship of §§ 4 and 5 is discussed in South Carolina v. Katzenbach, 383 U.S. 301, 317–320, 86 S.Ct. 803, 813–814, 15 L.Ed.2d 769, 780–782 (1966). *See* Beer v. United States, 374 F.Supp. 363, 379–381 (D.D.C.), prob. juris. noted, 419 U.S. 822, 95 S.Ct. 37, 42 L.Ed.2d 45 (1974).

12. As amended, 42 U.S.C. § 1973c (1970). The full text of § 5 provides:

 Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision

ly, however, Section 5 authorizes submission of the proposed change to the Attorney General,[13] and if he does not object within 60 days the change may be effected.[14] The Attorney General has construed Section 5, in regulations that have been upheld by the Supreme Court,[15] to require him to consider the submission by the same criteria that govern adjudication of a request for a declaratory judgment.[16] South Carolina has been in-

tercepted by Section 4,[17] and the parties agree that the prohibitions of Section 5 are applicable to the electoral changes involved in this case.[18]

On November 11, 1971, the General Assembly of South Carolina passed Act 932, which adopted alternative reapportionment plans for the state's Senate.[19] Both plans provided for multi-member districts,[20] required candidates to run for

with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting, qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of any qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

13. Through February 28, 1975, covered jurisdictions had submitted 4,476 proposed changes to the Attorney General for approval. H.R. Rep.No.397, 91st Cong., 1st Sess. 9–10 (1975). Only one proposed change has been brought initially to the District Court. U.S. Comm'n on Civil Rights, The Voting Rights Act: Ten Years After 29 (1975).

14. See note 12, *supra*.

15. Georgia v. United States, 411 U.S. 526, 536–539, 93 S.Ct. 1702, 1708–1710, 36 L.Ed.2d 472, 482–483 (1973).

16. "Section 5, in providing for submission to the Attorney General as an alternative to seeking a declaratory judgment from the U.S. District Court for the District of Columbia, imposes on the Attorney General what is essentially a judicial function. Therefore, the burden of proof on the submitting authority is the same in submitting changes to the Attorney General as it would be in submitting changes to the District Court for the District of Columbia. The Attorney General shall base his decision on a review of material presented by the submitting authority, relevant information provided by individuals or groups, and the results of any investigation conducted by the Department of Justice. If the Attorney General is satisfied that the submitted change does not have a racially discriminatory purpose or effect, he will not object to the change and will so notify the submitting authority. If the Attorney General determines that the submitted change has a racially discriminatory purpose or effect, he will enter an objection and will so notify the submitting authority. If the evidence as to the purpose or effect of the change is conflicting and the Attorney General is unable to resolve the conflict within the 60-day period, he shall, consistent with the above-described burden of proof applicable in the District Court, enter an objection and so notify the submitting authority." 28 C.F.R. § 51.19 (1974).

17. 30 Fed.Reg. 9897 (1965).

18. *See* Connor v. Waller, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975); Perkins v. Matthews, 400 U.S. 379, 385, 91 S.Ct. 431, 435, 27 L.Ed.2d 476, 483 (1971); Allen v. State Bd. of Elections, 393 U.S. 544, 555, 89 S.Ct. 817, 826, 22 L.Ed.2d 1, 11 (1969).

19. A brief summary of voting law changes in South Carolina over the past four years is in U.S. Comm'n on Civil Rights, *supra* note 13, at 214–219.

20. A significant number of the multi-member districts had substantial black populations.

numbered posts,[21] and imposed the requirement that primary elections be decided by majority vote. Several suits were filed in the District Court for the District of South Carolina [22] to enjoin the operation of Act 932 on the grounds that it violated the Voting Rights Act and, as well, the Fourteenth and Fifteenth Amendments. The cases were consolidated, and a three-judge court was convened to hear the challenges they presented.

While these actions were pending, South Carolina, on November 22, 1971, submitted Act 932 to the Attorney General for Section 5 approval. On March 6, 1972, the Attorney General interposed an objection to the changes it contemplated. He stated that on the basis of recent federal court decisions [23] he was "unable to conclude, with respect to [Act 932], that the combination of multi-member districts, numbered posts, and a majority (run-off) requirement would not occasion an abridgement of minority voting rights in South Carolina."[24]

About a month later, in Twiggs v. West,[25] the District Court for the District of South Carolina rejected the Fifteenth Amendment claim against Act 932, but held that the legislation unconstitutionally infringed Fourteenth Amendment rights because of impermissible population variances and invalid residency provisions.[26] The court refused to consider challenges based on the Voting Rights Act, recognizing that the District of Columbia was "the proper forum" for litigating them.[27] The court declined to draw its own reapportionment plan and indulged the General Assembly 30 days to enact an acceptable substitute.[28]

In response, on May 6, the General Assembly passed Act 1205—the legislation involved in this action—which, like its forerunner, provided alternative schemes for reapportioning the Senate. Act 1205 modified the prior residency feature and reduced the population variances,[29] but maintained the provisions for multi-member districts, numbered posts, and majority vote in primaries.[30] Act 1205 also included a provision extending the numbered post requirement to existing multi-member districts of the House of Representatives, the other chamber of the South Carolina General Assembly.[31] South Carolina submitted Act 1205 to the Attorney General on May 12, and eleven days later the Twiggs court held that the new Senate reapportionment comported with constitutional requirements.[32]

On May 30, while the Attorney General was considering Act 1205, South Carolina submitted additional legislation, Act 1204, to the Attorney General.[33] Act 1204 extended the numbered post requirement beyond the Senate to all multi-member elective districts in South Carolina. On June 16, 1972, in accordance with established procedure,[34] the

21. In this scheme candidates for election to the Senate in a multi-member district must run for a specific seat.

22. Appellees were among the plaintiffs in one of these suits.

23. *E.g.,* Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex.1972), aff'd in part and rev'd in part sub nom., White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

24. App. at 16.

25. Civ.No. 71–1106 (D.S.C. Apr. 7, 1972) (unreported).

26. *Id.* at 6–14. The court had deferred the constitutional challenge pending the Attorney General's § 5 determination, and the Attorney

General was invited to participate in the proceedings.

27. *Id.* at 4.

28. *Id.* at 16–17.

29. See text and note *supra* at note 26.

30. See text *supra* at notes 20–21.

31. Act 932 did not contain a similar provision.

32. Twiggs v. West, *supra* note 4.

33. In a separate suit, the *Twiggs* court had enjoined implementation of Act 1204 pending the Attorney General's § 5 review of that Act. Johnson v. West, Civ.No. 72–680 (D.S.C. June 14, 1972) (unreported). See cases cited note 18, *supra.*

34. "If the submission does not satisfy the requirements of [18 C.F.R.] § 51.10(a), the Attor-

Attorney General requested additional information regarding Act 1204. On June 19, he notified South Carolina that the information had been received, that the submission was complete, and that the 60-day period for review began to run on that date.[35]

On June 30, the Attorney General interposed an objection to Act 1204 and to the part of Act 1205 specifying numbered posts in the state House of Representatives.[36] The Attorney General declined to object, however, to the provisions of Act 1205 applicable to the Senate. His notification in that regard stated that he had independently concluded that Act 1205 had a racially discriminatory effect in contravention of Section 5, but that he felt "constrained to defer to the . . . determination of the three-judge District Court" in *Twiggs*.[37] "It would in our view not be appropriate," he said, "to read the Voting Rights Act as requiring or permitting the Attorney General to review a determination made by a United States District Court in the proper exercise of its statutory jurisdiction."[38]

On August 10, 1972, appellees filed the present litigation in the District Court for the District of Columbia challenging the Attorney General's failure to object to the Senate reapportionment contained in Act 1205. The District Court granted appellees' motion for summary judgment[39] on May 16, 1973, and ordered the Attorney General to make "a reasoned decision in accordance with his statutory responsibility."[40] In response to the order, the Attorney General filed a memorandum setting forth his position. "Act No. 1205," he declared, "has a clear and substantial racial effect in contravention of the Fifteenth Amendment and its protections under Section 5 of the Voting Rights Act."[41] "Indeed," he continued, "the reasons for finding a contravention of the Fifteenth Amendment in [Act 932] . . . are also present upon reviewing [Act 1205]."[42] Nevertheless, on the ground that he was constrained to bow to the *Twiggs* decision, the Attorney General reaffirmed his refusal to object.

On July 19, the District Court issued a second order, noting that appellants had "represented in open court that if the Attorney General considered Act 1205 without regard to the decision of the Three Judge District Court . . . , he would enter an objection to such act."[43] The court directed the Attorney General to "consider Act 1205 without regard to the decision of the Three Judge District Court."[44] On July 20, the Attorney General interposed an objection because he was "unable to conclude that Act No. 1205 does not have the effect of abridging voting rights on account of race."[45]

In this court, appellants contend that the District Court erred in entering these two orders.[46] We hold that the court had jurisdiction of appellees' action,[47] that the Attorney General's decision not to object was reviewable under the circumstances of this case,[48] and that Section 5 requires him to make an inde-

---

ney General shall request such further information as is necessary from the submitting authority and advise the submitting authority that the 60-day period will not commence until such information is received by the Department of Justice." 28 C.F.R. § 51.18(a) (1974).

35. See note 34, *supra.*

36. The constitutionality of this portion of Act 1205 was not considered by the *Twiggs* court, which ruled only on the Senate plan.

37. App. at 52.

38. *Id.*

39. A motion by appellants for summary judgment was denied.

40. Harper v. Kleindienst, *supra* note 5, 362 F.Supp. at 746.

41. App. at 89.

42. *Id.*

43. Harper v. Kleindienst, *supra* note 5, 362 F.Supp. at 746.

44. *Id.*

45. App. at 116.

46. Separate appeals were taken from the May 16 (No. 73–1766) and July 19 (No. 73–2035) orders. By our order the appeals were consolidated for all purposes.

47. See Part II, *infra.*

48. See Part III, *infra.*

pendent determination on the merits of the Section 5 issues.[49]

## II. JURISDICTIONAL ISSUES

We first address appellants' contention that the District Court was without jurisdiction to issue the challenged orders. Two grounds for this position are advanced. One is that the action was not timely.[50] The other is that the action could be heard and determined only by a three-judge court.[51] We find neither of these arguments acceptable.

### A. Timeliness of the Action

Act 1205 was submitted for the Attorney General's approval on May 12, 1972. Appellants contend that by the terms of Section 5 the Attorney General had to act upon the submission within 60 days of that date,[52] with the result that his refusal to object became "final" on July 11. On this premise they further contend that appellees' complaint in the District Court, filed on August 10, was not timely. Appellees respond that the 60-day period did not begin to run until South Carolina's submission was deemed complete on June 19,[53] and that in any event the District Court's jurisdiction did not depend upon the filing of suit within the period limiting action by the Attorney General.

We find it unnecessary to decide when the 60-day period specified by Section 5 began to run in this case. On its face, the specification is directed solely to the Attorney General's disapproval of proposals submitted pursuant to Section 5. Nothing in the text nor in the legislative history of that section suggests that this language has a longer reach. Without manifest distortion of the provision it is impossible to say that, simply because the Attorney General must act within 60 days after submission, a litigant opposing the Attorney General must do likewise. Aside from these considerations, the logical extension of appellants' argument is that judicial review of agency action must invariably be sought during the period within which the agency itself must act. Such an unprecedented holding would signal a deterioration in the wholesome process by which administrative agencies are subjected to a measure of judicial oversight. Courts are empowered to rectify agency action erroneously taken or to compel agency action erroneously withheld,[54] and continuing agency authority to act independently is not a jurisdictional prerequisite to such relief.[55] Fairly recently, in a case in which a petition for review of agency action was filed after the time for initial agency action had expired, we saw no jurisdictional problem and remanded the case for further agency proceedings.[56] Moreover, the Administrative Procedure Act authorizes

49. See Part IV, infra.

50. See text infra at notes 52–61.

51. See text infra at notes 62–87.

52. See note 12, supra.

53. See text supra at note 35. Under the Attorney General's regulation, the 60-day period would not have commenced until the state's submission was deemed complete. 28 C.F.R. § 51.18 (1974), quoted supra note 34. See Georgia v. United States, supra note 15, 411 U.S. at 540–541, 93 S.Ct. at 1710–1711, 36 L.Ed.2d at 484–485, approving this regulation. Appellants assert that the Attorney General's request for additional information related only to Act 1204, and that therefore the submission of Act 1205 was complete on May 12. See text supra at notes 33–35. Appellees argue that June 19 marked the beginning of the 60-day period for both statutes, because together they constituted South Carolina's numbered post plan and were so treated by the Attorney

General. See text supra at notes 36–38. The District Court agreed with appellees in this regard and entered an order on August 11 tolling the limitation period. Our resolution of the timeliness issue does not implicate this order, and we do not pass upon its validity.

54. 5 U.S.C. § 706 (1970).

55. See CAB v. Delta Air Lines, 367 U.S. 316, 326–327, 81 S.Ct. 1611, 1619–1620, 6 L.Ed.2d 869, 877 (1961).

56. In International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973), the Environmental Protection Agency acted on the last allowable day, id. at 420 & n. 14, 478 F.2d at 624 & n. 14, and the petition for review was filed 26 days thereafter. Nevertheless, we remanded for further agency proceedings, holding that an initial 60-day limitation period "obviously does not preclude further consideration [by the agency] following remand by the court." Id. at 446, 478 F.2d at 650.

judicial review after petitions for reconsideration are presented to the agency[57] —petitions that obviously can be disposed of after the time for initial agency action has expired. In the countless situations of that sort, appellants' thesis would foreclose judicial review merely because a party avails himself of his fullest opportunity to seek relief within the agency before invoking his remedies in court.

An equally basic difficulty with appellants' theory is that judicial review would be a practical impossibility were the Attorney General to delay his action until the last day upon which he could act.[58] Since only "final" agency action is subject to judicial scrutiny,[59] the review process cannot be instituted until after the Attorney General has acted,[60] and the Attorney General would in effect acquire the power to make unreviewable decisions under Section 5. It is clear enough that the Voting Rights Act did not grant the Attorney General unfettered discretion in the performance of his duties under Section 5.[61]

In sum appellants are asking us to fabricate a principle of administrative law that would warp Section 5, would conflict with precedent, and would grant the Attorney General, and as well all other administrators, decisional leeway that would not and should not otherwise exist. We hold that the 60-day limitation specified in Section 5 is applicable only to action by the Attorney General prior to judicial review, and that it did not render appellees' lawsuit untimely.

### B. Single-Judge Court Jurisdiction

■ Because the last sentence of Section 5 specifies that "[a]ny action under this section shall be heard and determined by a court of three judges,"[62] appellants urge, on this appeal for the first time,[63] that a single judge was without jurisdiction to pass on appellees' claims. Relying principally on the statutory language and a Supreme Court precedent, Allen v. State Board of Elections,[64] appellants argue that one judge, acting alone, was barred from deciding the issue tendered by appellees' lawsuit. For reasons that follow, we disagree.

In Allen, the Court addressed the applicability of Section 5's three-judge mandate to suits contesting new election laws allegedly covered by, but not cleared under, the provisions of Section 5.[65] The Court noted that such suits

---

57. See 5 U.S.C. § 704 (1970); 28 C.F.R. §§ 51.-23, 51.24 (1974).

58. Existing regulations would not allow the Attorney General to forego objection simply by remaining silent for 60 days, see 28 C.F.R. § 51.20 (1974), but that practice is not clearly barred by § 5. Cf. Robinson v. Pottinger, 512 F.2d 775, 776 n. 1 (5th Cir. 1975). If such a course is permitted and were it followed, the Attorney General's action would not become final until the 60th day passed, see note 60, infra, and under appellants' view of the law judicial review would be frustrated. See note 102, infra.

59. 5 U.S.C. § 704 (1970).

60. Agency action prior to the last step in an administrative proceeding may of course be final for the purposes of judicial review, but only if such action possesses a sufficient degree of finality. See, e. g., FPC v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938); Texas Gas Corp. v. FPC, 102 U.S.App.D.C. 59, 250 F.2d 27 (1957). It appears that the interposition of an objection and the notification that the Attorney General

will not object are the only "final" actions in a § 5 review.

61. This view has been accepted by the Supreme Court, see Georgia v. United States, supra note 15, and the Attorney General, see note 16, supra, and is discussed at greater length below. See text infra at notes 119–137.

62. See note 12; supra.

63. Appellants never moved in the District Court for a complement of three judges, nor did they ever suggest prior to appeal that the case could not be heard by a single judge. See 28 U.S.C. § 2284 (1970). Nevertheless, the point being jurisdictional, we deal with their argument.

64. Supra note 18.

65. The Allen plaintiffs sought to enjoin the operation of state statutes, an action that clearly must be heard by a three-judge court if constitutionally based. See 28 U.S.C. § 2281 (1970). The three-judge question arose, however, because the asserted invalidity of the legislation rested on statutory rather than constitutional grounds. Allen v. State Bd. of Elections, supra

comprised one of three types that "may be viewed as being brought 'under' § 5,"[66] and then proceeded to consider whether their presentation to three-judge courts was proper.[67] Recognizing that Section 5's three-judge language did not unequivocally answer the question, the Court turned to indicia of congressional intent.[68] "Congress has determined," the Court said, "that three-judge courts are desirable in a number of circumstances involving confrontations between state and federal power or in circumstances involving a potential for substantial interference with government administration."[69] The problems for the federal judiciary "are especially difficult," the Court continued, "when the enforcement of state enactments may be enjoined and state election procedures suspended because the State has failed to comply with a federal approval procedure."[70] "In drafting § 5," the Court declared, "Congress apparently concluded that if the governing authorities of a State differ with the Attorney General of the United States concerning the purpose or effect of a change in voting procedures, it is inappropriate to have that difference resolved by a single district judge."[71] The Court "conclude[d] that in light of the extraordinary nature of the Act in general, and the especially unique approval requirements of § 5, Congress intended that disputes involving the coverage of § 5 be determined by a district court of three judges."[72]

It is immediately apparent, however, that the case at bar differs from *Allen* in a number of important respects. In *Allen*, the plaintiffs founded their suit on Section 5's provision that "no person shall be denied the right to vote for failure to comply with" a new election law covered by but unapproved conformably with that section.[73] The *Allen* plaintiffs sought to enforce that provision by en-

note 18, 393 U.S. at 560, 89 S.Ct. at 829, 22 L.Ed.2d at 14. Therefore, § 2281 was not applicable, and a three-judge court was required only if some other provision so mandated. *Id.* at 560–561, 89 S.Ct. at 829, 22 L.Ed.2d at 14. *See* Swift & Co. v. Wickham, 382 U.S. 111, 127, 86 S.Ct. 258, 267, 15 L.Ed.2d 194, 205 (1965). The Court held that *Allen* was an action "under" § 5, and that Congress intended that all such actions be heard by three-judge courts. Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 563, 89 S.Ct. at 830, 22 L.Ed.2d at 16.

66. The Court said:

As we have interpreted § 5, suits involving the section may be brought in at least three ways. First, of course, the State may institute a declaratory judgment action. Second, an individual may bring a suit for declaratory judgment and injunctive relief, claiming that a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny. Third, the Attorney General may bring an injunctive action to prohibit the enforcement of a new regulation because of the State's failure to obtain approval under § 5. All these suits may be viewed as being brought "under" § 5.

Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 561, 89 S.Ct. at 829, 22 L.Ed.2d at 14.

67. "The issue is whether the language 'under this section' should be interpreted as authorizing a three-judge action in these suits." *Id.*

68. *Id.* at 562–563, 89 S.Ct. at 830, 22 L.Ed.2d at 15.

69. *Id.* at 562, 89 S.Ct. at 830, 22 L.Ed.2d at 15 (footnote omitted).

70. *Id.*

71. *Id.*

72. *Id.* at 563, 89 S.Ct. at 830, 22 L.Ed.2d at 16. *See,* to the same effect, United States v. Cohan, 470 F.2d 503 (5th Cir. 1972). Appellants also rely on Perkins v. Matthews, *supra* note 18, but that case is no different from *Allen* for present purposes. *Cf.* Georgia v. United States, *supra* note 15, 411 U.S. at 534–535, 93 S.Ct. at 1707–1708, 36 L.Ed.2d at 481. The Court held in *Perkins* that a three-judge court has jurisdiction to hear a suit to prevent implementation of election law changes covered by § 5 but not yet submitted for review pursuant thereto. See note 65, *supra*.

73. Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 555, 89 S.Ct. at 826, 22 L.Ed.2d at 11. The Court found it unnecessary to decide whether this provision created a new right rather than a new remedy, for "[h]owever the Act is viewed, the inquiry remains whether the right or remedy has been conferred upon the private litigant," *id.* at 556 n. 20, 89 S.Ct. at 827 n. 20, 22 L.Ed.2d at 11 n. 20, and that the Court answered in the affirmative. *Id.* at 557, 89 S.Ct. at 827, 22 L.Ed.2d at 12.

joining effectuation of new election laws pending their approval pursuant to Section 5.[74] That undertaking unavoidably necessitated a decision on coverage of the challenged laws, and portended disruption of state processes designed for its administration.[75]

The litigation before us, on the other hand, is predicated on statutory provisions generally authorizing federal courts to review agency action and to compel agency action wrongfully withheld.[76] Its only purpose is to secure performance by a federal officer of a duty allegedly imposed by federal law. That duty assertedly is to make an independent determination as to whether the legislation South Carolina submitted survives the test of Section 5, and to object or decline to object accordingly. No injunction against enforcement of the laws is sought, nor is any interference with their operation contemplated beyond what would follow, by force of Section 5, a validly interposed objection.[77]

We realize, of course, that any determination by the Attorney General, in response to a single-judge order demanding an independent resolution, will affect the submitting state for better or for worse, according to the determination that the Attorney General actually makes. But we cannot equate such a determination to a single-judge decision on the merits of the Section 5 issues posed by a submission. Although Section 5 denies a single judge power to

pass on those issues, it confers that very authority upon the Attorney General,[78] and we discern no impingement upon the policies underlying Section 5's three-judge requirement when the Attorney General exercises that authority pursuant to a single judge's order. The crucial consideration is that, though decision-making is dictated, the decision itself is not—the Attorney General, though compelled to decide, is left completely unfettered as to how to decide. Under those conditions, the Section 5 determination is the Attorney General's, not the judge's, and if the judge's order is valid it is a determination that the Attorney General should have made in the first place.[79]

With the case thus analyzed and the pivotal factors thus isolated, the course we must take is clear. The Supreme Court has frequently cautioned that statutory provisions summoning three-judge federal district courts are to be strictly construed.[80] This canon is to be observed, as scrupulously as elsewhere, with respect to calls of that nature in the Voting Rights Act.[81] Obediently to these principles, we must decline to apply the three-judge mandate of Section 5, not only to situations for which it clearly was not intended, but also to those only doubtfully within its reach.[82]

In the instant case, the District Court merely directed the Attorney General to formulate his own independent decision on the merits of South Carolina's Section

74. Id. at 558, 89 S.Ct. at 828, 22 L.Ed.2d at 12.

75. Id. at 558–559, 89 S.Ct. at 828, 22 L.Ed.2d at 13.

76. See 5 U.S.C. §§ 701–706 (1970); 28 U.S.C. § 1361 (1970), all invoked in appellees' complaint.

77. See note 12, supra.

78. See note 12, supra.

79. See Part IV, infra.

80. Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 98, 95 S.Ct. 289, 294, 42 L.Ed.2d 249, 257 (1974); Allen v. State Bd. of Elections, supra note 18, 393 U.S. at 561–562, 89 S.Ct. at 829–830, 22 L.Ed.2d at 15; Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800, 805 (1941).

81. See Allen v. State Bd. of Elections, supra note 18, 393 U.S. at 561–562, 89 S.Ct. at 829–830, 22 L.Ed.2d at 15.

82. Appellants' argument, if accepted, would create the possibility of two consecutive three-judge court proceedings: (a) one to ascertain whether the Attorney General has a duty to independently determine his response to a § 5 submission, and, if so, (b) another to resolve the § 5 questions generated by the submission. To what we have already said we need only add the Supreme Court's warning that "[c]onvening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift initial adjudication." Id. at 561, 89 S.Ct. at 829–830, 22 L.Ed.2d at 15.

5 submission. Such activity by the Attorney General could not impermissibly draw the court into a dispute as to Section 5's coverage of the state's legislative changes,[83] or as to the operability of those changes under Section 5.[84] To the extent that the Attorney General's activity might "involv[e] confrontations between state and federal power"[85] or generate "a potential for substantial interference with government administration,"[86] those consequences could be no greater than any instance in which the Attorney General on a state's request executes the function assigned by Section 5. In sum, the policies underlying Section 5's three-judge requirement seem completely foreign to the District Court's role in the situation at bar.[87] At the very best, any attempted reconciliation in this case of the three-judge provision and the congressional policy it represents is an exceedingly dubious venture.

We hold, then, that a single-judge District Court properly resolved this case. Our holding, of course, does not foreclose eventual litigation on the merits of the Section 5 issues before a court of three judges. Should South Carolina wish to challenge the objection that the Attorney General has registered, a declaratory judgment action before a properly convened three-judge District Court for the District of Columbia is still available.[88]

## III. REVIEWABILITY

Appellants next contend that the Attorney General's activities under Section 5, even when legally erroneous, are immune from judicial review. Appellants recognize, as they must, that final agency action is reviewable "except to the extent that . . . (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."[89] They argue, however, that Congress intended to ban review by the courts of any action the Attorney General takes under Section 5. They also argue that Section 5 action is committed to the Attorney General's discretion by law. We are not persuaded on either score.

### A. Statutory Preclusion

Surely nothing in Section 5, or elsewhere in the Voting Rights Act, expressly forbids judicial review of performances rendered by the Attorney General under Section 5. We have not been referred to, nor have we found, any such prohibition in any other federal statute. Similarly, the legislative history of the Act is silent as to any congressional purpose to exempt the Attorney General's activities under Section 5 from customary judicial review.

Appellants endeavor, however, to support their position on statutory preclusion by reference to the structure of Section 5's approval machinery. In lieu of a declaratory judgment action in the District Court for the District of Columbia, a state or political subdivision may submit proposed election law changes to the Attorney General for preclearance.[90] From that grant of this alternative and the statutory limit of 60 days for the Attorney General's response to the submission,[91] appellants assert that Congress has manifested a desire to avoid any delay incidental to proceedings in court, and that an intention to interdict judicial review of the Attorney General's action must accordingly be inferred.

---

**83.** See *id.* at 558–559, 89 S.Ct. at 828, 22 L.Ed.2d at 13.

**84.** See *id.*

**85.** See *id.* at 562, 89 S.Ct. at 830, 22 L.Ed.2d at 15.

**86.** See *id.*

**87.** The congressional concern so conspicuous when a federal court is asked to pass judgment on a state's election laws normally is lacking when the court's authority is invoked to review the action of a federal officer or agency. Indeed, Congress has broadly or-

dained that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (1970). This litigation was instituted and prosecuted in the District Court to do just that.

**88.** See note 82, *supra.*

**89.** 5 U.S.C. § 701(a) (1970). See *id.* § 702.

**90.** See note 12, *supra.*

**91.** See note 12, *supra.*

We believe this argument asks for too much. The structural features of Section 5 upon which appellants rely were end products of a congressional purpose entirely unrelated to delay necessitated by judicial review. The bill eventuating as the Voting Rights Act did not originally provide for a submission to the Attorney General as an alternative to a declaratory judgment action.[92] During hearings before the Senate Judiciary Committee, in response to questions about the burdens of such actions, Attorney General Katzenbach noted that many election law changes within the purview of Section 5 would be noncontroversial and nondiscriminatory.[93] On that basis, he suggested review by the Attorney General as an optional route to Section 5 approval, a technique calculated to serve adequately in a large number of instances.[94] Congress apparently accepted the suggestion, for in Section 5 it extended the option as the means to avoidance in many cases of a full-fledged lawsuit otherwise necessary.[95] Election law changes demonstrably free from discriminatory purpose and effect thus could be precleared through the Attorney General, while others would remain unenforceable unless and until subsequently approved in declaratory judgment proceedings as authorized by Section 5.

We cannot extrapolate from this morsel of legislative history a purpose to foreclose judicial review of the Attorney General's activities pursuant to Section 5. For all that his review of a large volume of submissions expectably could accomplish, Congress still assigned the judiciary a large and important role in the resolution of Section 5 questions. A state or political subdivision may forego the simpler and speedier mechanism of review by the Attorney General and avail itself of the opportunity of full-scale litigation of its position in a declaratory judgment action in the District Court for the District of Columbia.[96] It may resort to the declaratory judgment action even after incurring the Attorney General's disapproval following a submission to him.[97] In either case, the court's decision may be subjected to review and possible revision in the Supreme Court.[98]

So, while "[t]he provision [of Section 5] for submission to the Attorney General . . . gives the covered State a rapid method of rendering a new state election law enforceable," [99] it does not follow that Congress was unwilling to

---

**92.** The original bill (S. 1564) is reproduced at 111 Cong.Rec. 5403–5404 (1965). Section 5 of the Act in present form corresponds to § 8 of S. 1564 as introduced.

**93.** Hearings on S. 1564 Before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, at 237 (1965). Indeed, through February 28, 1975, the several Attorneys General in office since passage of the Act have objected to only 163 of the 4,476 proposed election law changes submitted pursuant to § 5. H.R.Rep.No.196, 94th Cong., 1st Sess., 9–10 (1975). For a list of all objections lodged through December 20, 1974, see U.S. Comm'n on Civil Rights, *supra* note 13, at 402–409.

**94.** Hearings on S. 1564, *supra* note 93, at 237.

**95.** The rationale for inserting this provision is not mentioned in the committee reports or the debates, perhaps because the major controversies surrounding § 5 involved the provision for exclusive jurisdiction in the District Court for the District of Columbia and the general notion of prospective suspension of election law changes pending approval. See, *e. g.*, S.Rep.

No.162, 89th Cong., 1st Sess., pt. 2, at 30, U.S.Code Cong. & Admin.News 1965, p. 2437 (1965) (individual views of Senators Eastland, McClellan and Ervin); 111 Cong.Rec. 8294, 8305, 8839 (1965). The only explanation is the testimony of Attorney General Katzenbach. See text *supra* at notes 93–94. We may assume that this logical explanation accurately portrays congressional intent. Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 576–577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187, 193 (1971); United States v. Henning, 344 U.S. 66, 72 n. 14, 73 S.Ct. 114, 118 n. 14, 97 L.Ed. 101, 106 n. 14 (1952); United States v. American Trucking Ass'ns, 310 U.S. 534, 547–548, 60 S.Ct. 1059, 1066, 84 L.Ed. 1345, 1353 (1940).

**96.** See note 12, *supra*.

**97.** See note 12, *supra*.

**98.** See note 12, *supra*.

**99.** Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 549, 89 S.Ct. at 823, 22 L.Ed.2d at 8.

indulge delay incidental to judicial examination of criteria leading the Attorney General in particular cases to decide not to object to a change covered by Section 5. Many innocuous changes submitted to the Attorney General may achieve expeditious preclearance at the Attorney General's hand, without resulting controversy over his decision. That goal is not embarrassed by the fact that other changes, germinating difficult questions under Section 5, may necessitate additional scrutiny.

Section 5 envisions situations of each type, and erects procedures to accommodate them both.[100] The Attorney General's implementing regulations likewise tolerate delay in complex cases by specifying that the 60-day period for considering the submission does not commence until receipt of any additional information the Attorney General may request.[101] Moreover, delay consequent to judicial correction of legal error in the disposition of a submission does not impede the overall operation of Section 5. On the contrary, judicial clarification of its requirements is a step well calculated to enhance its effective application.[102]

Perhaps singularly, appellants offer no response to the suggestion that Congress would have explicitly foreclosed judicial review if that is what it desired to do.[103] Indeed, Section 4(b) of the Act expressly precludes judicial review of administrative determinations that a state or political subdivision is subject to the provisions of that section.[104] Thus in at least the one instance where we know Congress intended to bar judicial review, it legislated precisely to that effect. On the other hand, we reiterate, Congress has nowhere indicated a prohibition of judicial review of the Attorney General's actions under Section 5.[105]

The Voting Rights Act "implemented Congress' firm intention to rid the country of racial discrimination in voting."[106] It was "drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens."[107] "Congress realized that existing remedies were inadequate to accomplish this purpose and drafted an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws."[108] We have seen that Congress conferred upon the states and their political subdivisions the full protection of the judicial process in their efforts to clear new election law changes

---

100. See note 12, *supra*.

101. 28 C.F.R. § 51.18 (1974), quoted *supra* note 34.

102. Appellants also urge that § 5 does not require a response when the Attorney General determines not to interpose an objection. See note 12, *supra*. Cf. Robinson v. Pottinger, *supra* note 58, 512 F.2d at 776 n. 1. Therefore, they argue, South Carolina would have complied with § 5 if the Attorney General had remained silent for 60 days, and judicial review would not have been available. This argument is wide of the mark as long as the Attorney General's regulations, which are binding on him, require a response. 28 C.F.R. § 51.19 (1974), quoted *supra* note 16. See also note 128, *infra*. It would be totally illogical to hold that agency noncompliance with established deadlines is irremediable in view of statutory authority to compel agency action that has been unlawfully withheld. 5 U.S.C. § 706 (1970). Furthermore, even without compulsion of a response, silence would become final agency action after 60 days, and we perceive no reason for holding silence unreviewable. In any event, in this case the Attorney General communicated his decision not to object and stated his reasons, and we must measure the validity of his action by the explanation he gave. SEC v. Chenery Corp., 318 U.S. 80, 92, 63 S.Ct. 454, 461, 87 L.Ed. 626, 635 (1943); Garrett v. FCC, 168 U.S.App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975).

103. *Cf.* Davies Warehouse Co. v. Bowles, 321 U.S. 144, 146, 64 S.Ct. 474, 481, 88 L.Ed. 635, 644 (1944); March v. United States, 165 U.S. App.D.C. 267, 276–277, 506 F.2d 1306, 1315–1316 (1974).

104. 42 U.S.C. § 1973b(b) (1970), quoted *supra* note 11.

105. See text *supra* preceding note 90.

106. Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 548, 89 S.Ct. at 822, 22 L.Ed.2d at 7.

107. *Id.* at 556, 89 S.Ct. at 826, 22 L.Ed.2d at 11.

108. *Id.*

for operation. We cannot assume that a legislature bent on concretizing the right to vote intended a lesser solicitude towards those whom the Act was designed to benefit. Voters affected by changes covered by Section 5 can insist on judicial relief from enforcement of those changes until they are approved pursuant to Section 5.[109] They may also voice their positions in declaratory judgment actions under Section 5 by the simple expedient of intervening in those proceedings.[110] Unless, however, they may obtain judicial review of the Attorney General's methodology on Section 5 submission, the bond of protection is incomplete. Should the Attorney General decide not to object, the proposed change goes into operation immediately,[111] without any opportunity for judicial consideration of voter positions on the Section 5 questions. True it is, as appellants say, that in the latter event voters can resort to traditional suits grounded on the Fifteenth Amendment. "But," as the Supreme Court has observed, "it was the inadequacy of just these suits for securing the right to vote that prompted Congress to pass the Voting Rights Act." [112]

Statutory preclusion of judicial review of administrative action, whenever it oc-

curs, is a consequence of plain legislative intent. The Supreme Court has declared that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress" [113] and that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." [114] No such showing has been made in this case. Neither the text nor the legislative history of the Voting Rights Act reflects a congressional purpose to proscribe judicial review of the Attorney General's activities under Section 5. There is no suggestion that any other federal legislation does so. We note that appellees are not challenging findings by the Attorney General on issues of fact, or an ultimate decision as to whether the submitting authority has discharged its burden of proving lack of discriminatory purpose or effect.[115] Rather, appellees contend simply, and the District Court held only, that the Attorney General improperly relinquished his responsibility to independently evaluate the submitted legislation in light of the standards established by Section 5.[116] We find no basis for holding

**109.** *Id.* at 560, 89 S.Ct. at 829, 22 L.Ed.2d at 14.

**110.** *See* City of Richmond v. United States, 376 F.Supp. 1344, 1349 n. 23 (D.D.C.1974), vacated and remanded, 422 U.S. 358, 95 S.Ct. 2296, 44 L.Ed.2d 245 (1975); Beer v. United States, *supra* note 11, 374 F.Supp. at 367 n. 5; City of Petersburg v. United States, 354 F.Supp. 1021, 1024 (D.D.C.1972), aff'd, 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973).

**111.** See note 12, *supra.*

**112.** Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 556 n. 21, 89 S.Ct. at 827 n. 21, 22 L.Ed.2d at 12 n. 21.

**113.** Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681, 686 (1967). *See* Barlow v. Collins, 397 U.S. 159, 166–167, 90 S.Ct. 832, 837–838, 25 L.Ed.2d 192, 199–200 (1970); Leedom v. Kyne, 358 U.S. 184, 190, 79 S.Ct. 180, 185, 3 L.Ed.2d 210, 215 (1958); Brownell v. Tom We Shung, 352 U.S. 180, 185, 77 S.Ct. 252, 256, 1 L.Ed.2d 225, 229 (1956).

**114.** Abbott Laboratories v. Gardner, *supra* note 113, 387 U.S. at 141, 87 S.Ct. at 1511, 18

L.Ed.2d at 687, quoting H.R.Rep.No.1980, 79th Cong., 2d Sess. 41 (1946). *See* Rusk v. Cort, 369 U.S. 367, 379–380, 82 S.Ct. 787, 794, 7 L.Ed.2d 809, 817 (1962); Heikkila v. Barber, 345 U.S. 229, 232, 73 S.Ct. 603, 604–605, 97 L.Ed. 972, 976 (1953).

**115.** We express no opinion on reviewability of a determination not to object allegedly involving an erroneous application of § 5's purpose-effect standard. We note, however, that orthodox judicial review of a decision to interpose an objection presents different questions. It may be that Congress intended to confine review of such a decision to the declaratory judgment action specified in § 5. *See* Allen v. State Bd. of Elections, *supra* note 18, 393 U.S. at 562, 89 S.Ct. at 830, 22 L.Ed.2d at 15; United Jewish Orgs. of Williamsburgh v. Wilson, 510 F.2d 512, 520 (2d Cir. 1974).

**116.** Appellees concede that appellants' concerns about delay might have more force if raised in the context of review of a determination by the Attorney General on the merits of § 5 issues. Appellants' complaint of delay due to judicial review is nevertheless unpersuasive even in such cases. Section 5 expressly re-

that judicial review in these circumstances is statutorily precluded.[117]

## B. Administrative Discretion

■ Appellants also contend that even if normal judicial review is not precluded in this case by reason of congressional intent, it is foreclosed because Section 5 action by the Attorney General is "committed to agency discretion by law."[118] We find that position untenable. The statutory exemption of that sort of action from judicial review is "a very narrow exception,"[119] one which is "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"[120] That certainly is not the situation here.

To be sure, Section 5 does not expressly define the standards or procedures that the Attorney General is to utilize in discharging his responsibilities toward state submissions. But the Attorney General has promulgated regulations prescribing standards, as well as procedures, by which election law changes submitted to him for approval can be objectively and accurately evaluated.[121] One such regulation declares that "Section 5, in providing for submission to the Attorney General as an alternative to seeking a declaratory judgment from the U.S. District Court for the District of Columbia, imposes on the Attorney General what is essentially a judicial function."[122] For this reason, the regulation states, "the burden of proof on the submitting authority is the same in submitting changes to the Attorney General as it would be in submitting changes to the District Court for the District of Columbia."[123] "If," the regulation further provides, "the Attorney General is satisfied that the submitted change does not have a racially discriminatory purpose or effect, he will not object to the change and will so notify the submitting authority. If the Attorney General determines that the submitted change has a racially discriminatory purpose or effect, he will enter an objection and will so notify the submitting authority."[124] And "[i]f the evidence as to the purpose or effect of the change is conflicting, and the Attorney General is unable to resolve the conflict within the 60-day period, he shall, consistent with the above-described burden of proof applicable in the District Court, enter an objection and so notify the submitting authority."[125]

■ These provisions leave no room for argument that the Attorney General's Section 5 function is "committed to agency discretion"[126] because "there is no law to apply."[127] They establish the

---

serves the right to bring "traditional" actions challenging election law changes regardless of the result of § 5 proceedings. See note 12, *supra*. It is clear beyond peradventure that such actions could result in significant delays in the operation of the new laws.

117. Appellants maintain that Allen v. State Bd. of Elections, *supra* note 18, indicates that the Supreme Court has taken a contrary position. They cite the Court's statement that "[o]nce the State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality; there is no further remedy provided by § 5." *Id.* at 549–550, 89 S.Ct. at 823, 22 L.Ed.2d at 8. That statement is merely a reference to the express provisions of § 5, and obviously was not intended as a catalog of all possible remedies in disputes involving allegedly discriminatory suffrage laws. It is patently unreasonable to interpret this sentence as excluding remedies grounded in statutes other than § 5.

118. 5 U.S.C. § 701(a)(2) (1970). See also text *supra* at note 89.

119. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136, 150 (1971).

120. *Id.*, quoting S.Rep.No.752, 79th Cong., 1st Sess. 26 (1945). See Adams v. Richardson, 156 U.S.App.D.C. 267, 270, 480 F.2d 1159, 1162 (1973).

121. 28 C.F.R. §§ 51.1 *et seq.* (1974).

122. 28 C.F.R. § 51.19 (1974), quoted *supra* note 16.

123. *Id.*

124. *Id.*

125. *Id.*

126. See text *supra* at note 89.

127. See text *supra* at note 120.

rule [128] that the Attorney General must pass on a Section 5 submission by application of the same standard—whether it has discriminatory purpose or effect [129]—prescribed by Section 5 for declaratory judgment actions brought under its aegis. [130] Thus the determination the Attorney General makes on Section 5 submissions is an adjudication in the traditional sense—the application of legal principles to a specific factual situation. In no sense barring judicial review is the function discretionary.

▆▆▆▆ It is evident, then, that the Attorney General himself interprets Section 5 as the imposition of a nondiscretionary function on his office. As he himself characterizes his activity under Section 5, he performs "what is essentially a judicial function." [131] And as the Supreme Court has noted, the Attorney General has not read Section 5 as a grant of "unfettered discretion as to procedures, standards, and administration in this sensitive area," [132] but as a call "to formulate and publish objective ground rules." [133] The Court has sustained the validity of the Attorney General's adoption of the same substantive and burden-of-proof [134] standards that Section 5 sets for declaratory judgment actions, [135] and the Attorney General's regulation binds him [136] to those standards in Section 5 determinations. [137] The net result is that the Attorney General is obliged to adjudicate Section 5 submissions in the same manner the court adjudicates declaratory judgment actions. No less in the one instance than in the other is the function nondiscretionary, and reviewable in a proper judicial forum.

## IV. DEFERENCE TO LOCAL COURT DECISIONS

Appellants contend lastly that the Attorney General properly performed his Section 5 duty in this case by concluding that he should defer to the holding in Twiggs v. West [138] that Act 1205 does not violate the Fifteenth Amendment. Appellants assert, on the premise that the substantive standards set by Section 5 and the Fifteenth Amendment are identical, that interposition of an objection would be tantamount to the overruling of a final judicial decision. [139] They also assert that a Supreme Court decision precludes an objection in the situation here. [140] We discuss these contentions and also conclude that appellants' position is fundamentally inconsistent with clearly expressed congressional intent underlying Section 5. [141]

▆▆▆▆ An important difference between Fifteenth Amendment and Section 5 litigations over alleged voting discrimination is the allocation of the burden of proof. A plaintiff who challenges a state law on Fifteenth Amendment grounds must carry the burden of demonstrating that the law is unconstitution-

128. The Attorney General is bound by his own regulations. Vitarelli v. Seaton, 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012, 1016–1017 (1959); Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403, 1418 (1957); Nader v. Nuclear Regulatory Comm'n, 168 U.S.App.D.C. 255, 261, 513 F.2d 1045, 1051 (1975).

129. See note 12, *supra.*

130. See text *supra* at note 12.

131. See text *supra* at note 122.

132. *Georgia v. United States, supra note 15,* 411 U.S. at 536, 93 S.Ct. at 1708, 36 L.Ed.2d at 482.

133. *Id.·*

134. "The very effect of § 5 was to shift the burden of proof with respect to racial discrimination in voting. Rather than requiring affect-

ed parties to bring suit to challenge every changed voting practice, States subject to § 5 were required to obtain prior clearance before *proposed changes could be put into effect.* The burden of proof is on 'the areas seeking relief.'" Georgia v. United States, *supra* note 15, 411 U.S. at 538 n. 9, 93 S.Ct. at 1709 n. 9, 36 L.Ed.2d at 483 n. 9, quoting South Carolina v. Katzenbach, *supra* note 11, 383 U.S. at 335, 86 S.Ct. at 822, 15 L.Ed.2d at 791.

135. See note 12, *supra.*

136. See note 128, *supra.*

137. See text *supra* at note 130.

138. *Supra* note 4.

139. See text *infra* at notes 142–159.

140. See text *infra* at notes 160–166.

141. See text *infra* at notes 167–168.

al.[142] Accordingly, the *Twiggs* court rejected the Fifteenth Amendment claim against Act 1205 for the stated reason that evidence indicating its unconstitutionality was lacking.[143] In contrast, the burden of proof in Section 5 proceedings is on the state or political subdivision seeking approval of a voting change.[144] The *Twiggs* court did not conclude—indeed the question was not presented [145]—that South Carolina could have carried the burden of proof imposed by Section 5.

 Appellants encounter a further problem in connection with their contention that the Fifteenth Amendment proscribes voting procedures that are racially discriminatory either in purpose or effect.[146] That clearly is the standard constructed by Section 5,[147] but the case law in its current state leaves uncertain whether a Fifteenth Amendment challenge based solely on a racially discriminatory effect, as distinguished from purpose, can be successfully maintained. Supreme Court decisions invalidating voting practices as violative of the Fifteenth Amendment have uniformly relied upon evidence of racially discriminatory motivation.[148] Numerous other cases have regarded determinations of purpose and effect as involving distinct questions.[149] We need not enter

---

142. White v. Regester, 412 U.S. 755, 765–766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973); Whitcomb v. Chavis, *supra* note 23, 403 U.S. at 149–150, 91 S.Ct. at 1872, 29 L.Ed.2d at 370–380; Murphy v. Ramsey, 114 U.S. 15, 37–38, 5 S.Ct. 747, 760, 29 L.Ed. 47, 55 (1885); Bradas v. Rapides Police Jury, 508 F.2d 1109, 1112 (5th Cir. 1975). *See* Georgia v. United States, *supra* note 15, 411 U.S. at 538 n. 9, 93 S.Ct. at 1709 n. 9, 36 L.Ed.2d at 483 n. 9.

143. Twiggs v. West, *supra* note 25, at 18.

144. Georgia v. United States, *supra* note 15, 411 U.S. at 538, 93 S.Ct. at 1709, 36 L.Ed.2d at 483; South Carolina v. Katzenbach, *supra* note 11, 383 U.S. at 335, 86 S.Ct. at 822, 15 L.Ed.2d at 791; Beer v. United States, *supra* note 11, 374 F.Supp. at 392–393; City of Petersburg v. United States, *supra* note 110, 354 F.Supp. at 1027. See note 16, *supra*. See also H.R.Rep. No.397, 91st Cong., 1st Sess. 8 (1969); H.R. Rep.No.196, 94th Cong., 1st Sess. 8 (1975).

145. See text *supra* at note 27.

146. See note 12, *supra*. In support of this position appellants cite Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In that case, the Court invalidated a reapportionment that was infected with a discriminatory motive. The Court said that "the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote." *Id.* at 341, 81 S.Ct. at 127, 5 L.Ed.2d at 113. The Court also relied on the apparent lack of an alternative motive, *id.* at 342, 81 S.Ct. at 127, 5 L.Ed.2d at 113; noted that the state legislature had "single[d] out a readily isolated segment of a racial minority for special discriminatory treatment," *id.* at 346, 81 S.Ct. at 130, 5 L.Ed.2d at 116; and found that the reapportionment was used to circumvent the Fifteenth Amendment, *id.* at 347, 81 S.Ct. at 130, 5 L.Ed.2d at 117. *See*

City of Richmond v. United States, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); Whitcomb v. Chavis, *supra* note 23, 403 U.S. at 149, 91 S.Ct. at 1872, 29 L.Ed.2d at 379; Griffin v. County School Bd., 377 U.S. 218, 231, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256, 265 (1964); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1268 (1970). *But see* Palmer v. Thompson, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, 445 (1971); United States v. O'Brien, 391 U.S. 367, 384–385, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672, 684–685 (1968).

147. See note 12, *supra*.

148. The Court has noted that some Fifteenth Amendment litigation has involved "tests . . . which are specifically *designed* to prevent Negroes from voting," South Carolina v. Katzenbach, *supra* note 11, 383 U.S. at 310, 86 S.Ct. at 809, 15 L.Ed.2d at 776 (emphasis added), and that other cases "demonstrate[] the variety and persistence of these and similar institutions *designed* to deprive Negroes of the right to vote." *Id.* at 311, 86 S.Ct. at 810, 15 L.Ed.2d at 777 (emphasis added). *See, e. g.*, Gomillion v. Lightfoot, *supra* note 146, 364 U.S. at 346–347, 81 S.Ct. at 130, 15 L.Ed.2d at 116; Terry v. Adams, 345 U.S. 461, 463–464, 73 S.Ct. 809, 811, 97 L.Ed. 1152, 1157 (1953); Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287 (1939); Guinn v. United States, 238 U.S. 347, 361, 35 S.Ct. 926, 930, 59 L.Ed. 1340, 1346 (1915). Although some statements in reference to Section 5 indicate that the statutory and constitutional standards are identical, *see* South Carolina v. Katzenbach, *supra* note 11, 383 U.S. at 334–335, 86 S.Ct. at 821–822, 15 L.Ed.2d at 790, the context of these remarks leaves unclear whether the Court intended to pass on the question presented by appellants' argument.

149. In City of Richmond v. United States, *supra* note 146, the Court first discussed the ef-

the debate for the important consideration is not our thought on the question but the view of the *Twiggs* court when it rendered its Fifteenth Amendment decision. The point we make is that an objection by the Attorney General under Section 5 is not necessarily in conflict with a prior judicial determination on constitutionality.

The opinion rendered by the *Twiggs* court does not reflect any consideration, for the purpose of Fifteenth Amendment claims, of the possible discriminatory effect of Act 1205. The holding was based on the absence of "evidence that . . South Carolina has ever been motived by racial considerations." [150] In contrast, the Attorney General's independent assessment of Act 1205 was based on his view of the *effect* of the legislation.[151] We are constrained to conclude that his objection to Act 1205 cannot be regarded as "overruling" the *Twiggs* decision, and that there was no judicial decision on the "effect" aspect of the Section 5 issues to

which the Attorney General could in any event defer in this case.[152]

The result we reach today is consistent with the position taken by the Department of Justice in other litigation. In City of Richmond v. United States,[153] the Department filed a memorandum [154] distinguishing a Fourth Circuit decision under the Fifteenth Amendment from administrative proceedings under Section 5.[155] The reason asserted for the distinction was the difference in burden of proof.[156] The Department did not take the position that the constitutional and statutory standards were identical,[157] but instead asserted that the Fourth Circuit decision was not binding on the Attorney General regardless of the similarity of standards. Significantly, the concluding paragraph of the Fourth Circuit's opinion [158] stated that the decision "reflects no opinion as to the appropriateness or inappropriateness of the Attorney General's objection." [159]

fect of the proposed annexation, *id.* 95 S.Ct. at 2302, and then turned to an examination of the city's purpose, *id.* at 2304. *See* Beer v. United States, *supra* note 11, 374 F.Supp. at 367; City of Petersburg v. United States, *supra* note 110, 354 F.Supp. at 1027.

**150.** Twiggs v. West, *supra* note 25, at 18.

**151.** See text *supra* at note 42.

**152.** We emphasize that we do not undertake to decide whether a Fifteenth Amendment challenge may present an issue concerning solely the effect of allegedly discriminatory legislation. See text *supra* at notes 146–149. We merely intend to note that there is some uncertainty in this regard, which may have influenced the Fifteenth Amendment decision in *Twiggs,* and that there was no judicial determination in *Twiggs* regarding the effect of Act 1205 for Fifteenth Amendment purposes. But even if there were, the difference in the burden of proof remains, see text *supra* at notes 142–145, and for this reason alone, the Attorney General's uncritical reliance on the *Twiggs* decision is highly dubious. Beyond these considerations, the extreme deference that the Attorney General gave *Twiggs* is itself inconsistent with the congressional intent discussed below. See text *infra* at notes 167–168. We have no doubt, however, that the Attorney General may properly accord some weight to judicial decisions in which identical or similar issues are adjudicated.

**153.** *Supra* note 110.

**154.** Defendants' Memorandum of Law, filed July 2, 1973. The relevant portion of this memorandum responded to an inquiry by the court as to whether the prior decision in Holt v. City of Richmond, 459 F.2d 1093 (4th Cir.), cert. denied, 408 U.S. 931, 92 S.Ct. 2510, 33 L.Ed.2d 343 (1972), was binding on the parties under the principles of collateral estoppel. *See* City of Richmond v. United States, *supra* note 146, 95 S.Ct. at 2305 n.6.

**155.** The Attorney General interposed an objection to the proposed annexation of an area containing a large number of white voters. The Fourth Circuit subsequently held that the annexation did not violate the Fifteenth Amendment. Holt v. City of Richmond, *supra* note 154. In the instant case, the *Twiggs* decision preceded the Attorney General's determination, but the basic position taken by the Department in *Richmond* is nevertheless relevant.

**156.** See text *supra* at notes 142–145.

**157.** See text *supra* at note 146.

**158.** We note that the author of this opinion was the presiding judge in Twiggs v. West, *supra* note 25.

**159.** Holt v. City of Richmond, *supra* note 154, 459 F.2d at 1100.

Appellants' final argument is that the Supreme Court's decision in Connor v. Johnson[160] bars the Attorney General from interposing an objection in this case. Appellants say that the "lesson" of Connor is that the protections afforded by Section 5 are sufficiently honored by judicial consideration of a Fifteenth Amendment challenge, and that therefore the Attorney General should not object to election law changes approved by a federal court. In this way, as their argument goes, both the federal courts and the Attorney General may fully meet their responsibilities without invading the jurisdiction of the other, and while still effectuating the Voting Rights Act.

The Court held in Connor that a reapportionment plan formulated by a federal court,[161] rather than a legislative body, is not within the scope of Section 5.[162] Section 5 plainly applies only to suffrage changes proposed by "a State or political subdivision,"[163] so the Court held that "[a] decree of the United States District Court is not within the reach of Section 5."[164] But Connor provides no support for the Attorney General's complete deference in the instant case to a judicial decision on issues distinguishable from those presented under Section 5.[165] Appellants are saying in effect that constitutional approval of an election law change by a federal court, if rendered with sufficient speed, could obviate the need for Section 5 approval. In light of the congressional determination that available constitutional remedies are inadequate, and that thus enactment of Section 5 was necessitated,[166] we cannot place the stamp of approval on that result.

Finally, undeviating deference by the Attorney General conflicts directly with the congressional objective in vesting exclusive jurisdiction of actions under Section 5 in the District Court for the District of Columbia.[167] Congress intended that the Section 5 standard be applied uniformly to covered states, and to accomplish this end directed that all litigation under Section 5 take place in the District of Columbia.[168] To the extent that the Attorney General accords conclusive weight to local court determinations, the congressional goal of decisional uniformity may be frustrated.

Appellants profess concern that the interposition of an objection, where a court

160. 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

161. The Twiggs court did approve the reapportionment plan delineated in Act 1205, but it did not make the initial determinations incidental to reapportioning the State Senate. See text supra following note 27. Compare Connor v. Johnson, supra note 160, 402 U.S. at 691, 91 S.Ct. at 1761, 29 L.Ed.2d at 270.

162. See Chapman v. Meier, 420 U.S. 1, 17–19, 95 S.Ct. 751, 761–762, 42 L.Ed.2d 766, 779–780 (1975); Georgia v. United States, supra note 15, 411 U.S. at 535 n. 6, 93 S.Ct. at 1708 n. 6, 36 L.Ed.2d at 481 n. 6.

163. See note 12, supra.

164. Connor v. Johnson, supra note 160, 402 U.S. at 691, 91 S.Ct. at 1762, 29 L.Ed.2d at 270. The majority of the Court did not expressly rely on any theory of federalism or comity, contrary to appellants' suggestion here. The Court's decision is entirely consistent with the purpose of Congress to put an end to the frustration of judicial review in voting rights cases fostered by repeated enactment of new laws after litigation had success-fully challenged prior legislation. H.R.Rep.No. 439, 89th Cong., 1st Sess. (1965), U.S.Code Cong. & Admin.News 1965, p. 2437; 111 Cong. Rec. 8303 (1965) (remarks of Senator Hart). See H.R.Rep.No.196, 94th Cong., 1st Sess. 8 (1975); 115 Cong.Rec. 38490 (1969).

165. The panel opinion in Zimmer v. McKeithen, 467 F.2d 1381 (5th Cir. 1972), rev'd on other grounds, 485 F.2d 1297 (en banc 1973), offers no aid to appellants. The panel there "noted that this is not a case in which a legislature, board, or commission attempted to reapportion itself. In such a case, Section 5 clearly applies." Id. at 1383.

166. See text supra at note 112.

167. City of Richmond v. United States, supra note 146, 95 S.Ct. at 2309 n.7 (Brennan, J., dissenting). See note 12, supra.

168. 111 Cong.Rec. 8839, 10355, 15663 (1965). See 115 Cong.Rec. 38486 (1969). An amendment to vest jurisdiction in local federal courts was soundly defeated in 1965, 111 Cong.Rec. 10371 (1965), and again this year, 121 Cong. Rec. H. 4899 (daily ed. June 4, 1975).

has previously declared an election law change to be consistent with the Fifteenth Amendment, might destroy the present "cooperation" between judicial and administrative authorities in administering Section 5. We need only respond that this view is simply not a realistic assessment of the Attorney General's Section 5 responsibility, nor is it likely to be an accurate prediction of the judicial attitude in such circumstances.[169] Because constitutional challenges and Section 5 proceedings do not necessarily present the same issues, an objection to a provision previously held constitutional is not inexorably a contradiction of the prior judicial resolution.

For the reasons stated, the orders appealed from are in all respects

Affirmed.

MacKINNON, *Circuit Judge* (dissenting):

I am in agreement with the conclusion that a three-judge court would not be required by section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1970), in an action for review under the Administrative Procedure Act of the procedures followed by the Attorney General in withholding objection to statutes submitted under section 5. I also agree that the Attorney General was not obliged to defer to the prior decision by the three-judge district court in South Carolina but could instead make an independent assessment of the discriminatory effect of Act 1205. However, these issues are irrelevant unless it is first determined that the Attorney General's decision to withhold objection to legislation submitted under section 5 is subject to judicial review.

Section 5 provides that a statute affecting voting rights may be enforced if it has been submitted to the Attorney General and the Attorney General "has not interposed an objection within sixty days after such submission . . . ." To my mind, this language authorizes approval by *inaction*. Surely no one would contend that if the Attorney General took no action whatsoever, as is clearly authorized by the statute, that inaction could be subject to judicial review under the APA. It is hard to imagine a clearer instance of a matter "committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1970). I doubt that any greater power of judicial review exists simply because the Attorney General has chosen to give a reason, albeit an erroneous one, for his refusal to interpose an objection. The fact that he has adopted regulations requiring him to act affirmatively or negatively on each submission using set standards should not operate to confer additional powers of judicial review beyond what is indicated in the language of section 5.

Section 5 itself designates the proper method of obtaining judicial review in this case by providing that "the Attorney General's failure to object . . . shall [not] bar a subsequent action to enjoin enforcement of any such qualification, prerequisite, standard, practice, or procedure." I recognize the majority's concern that the so-called "traditional" Fifteenth Amendment actions may not be the most effective means of safeguarding voting rights. However, since section 5 simply created a new method for preventing discriminatory voting restrictions without disturbing the "traditional" procedures, it is not unreasonable to believe that Congress would remit parties challenging voting laws to the preexisting remedies in appropriate circumstances. Congress chose to repose a large measure of trust in the Attorney General's performance of his duties under section 5. It is for Congress, and not the courts, to determine if that trust was misplaced and judicial scrutiny of the Attorney General's actions under section 5 is now necessary.

In my view, the majority is exposing the courts to a potentially large influx of cases seeking review of refusals by the Attorney General to interpose objections under section 5. If the issue of compliance with a procedural regulation is sub-

---

**169.** See text *supra* at note 159.

ject to review under the APA despite section 5, there would seem to be little basis for distinguishing a complaint seeking APA review of the Attorney General's compliance with his substantive regulations guiding his decision on whether to interpose an objection. The majority has taken the first step to developing a means of judicial review which could ultimately supplant the "subsequent action to enjoin enforcement" which Congress so carefully preserved in section 5. To this extent, I thus dissent.