796 F.2d 1091
 Re Naturalization of Antolin Punsalan PANGILINAN, et al.,
Petitioners- Appellants,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.
Re Naturalization of Mario Valderrama LITONJUA, Petitioner-Appellant,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.
 Nos. 80-4543, 81-5427.
 United States Court of Appeals,
Ninth Circuit.
 Argued Aug. 13, 1982.
Submitted March 20, 1985.
Aug. 11, 1986.
 
 Donald L. Ungar, Lawrence N. Di Costanzo, Simmons & Ungar, San Francisco, Cal., for petitioners-appellants.
 Lauri Steven Filppu, John T. Bannon, Jr., Marshall Tamor Golding, Frank O. Bowman, III, Washington, D.C., for respondent-appellee.
 Appeals from the United States District Courts for the Northern and Southern Districts of California.
 Before SCHROEDER, FLETCHER and NORRIS, Circuit Judges.
 NORRIS, Circuit Judge:
 
 
 1
 These appeals involve the naturalization petitions of 15 Filipino nationals who served honorably in the United States armed forces during World War II. All 15 veterans claim they are entitled to American citizenship under Secs. 701-705 of the Nationality Act of 1940, Pub.L. No. 76-853, 54 Stat. 1137, as amended by the Second War Powers Act Sec. 1001, Pub.L. No. 77-507 Sec. 1001, 56 Stat. 182 ("1940 Act"). The naturalization petitions were opposed by the Immigration and Naturalization Service (INS) and denied by the district courts. This court's jurisdiction over these appeals rests on 28 U.S.C. Sec. 1291 (1982).
 
 
 2
 * A
 
 
 3
 In March 1942, Congress amended the 1940 Act to provide an easier road toward American citizenship for all non-citizens who served honorably in the United States armed forces. Non-citizen servicemen were exempted from such naturalization requirements as five years of residency in the United States and proficiency in the English language. 1940 Act, Sec. 701. As the legislative history of these amendments makes clear, Congress's intent was to provide that "if a man is ready to fight for our country we ought to give him the benefits of citizenship without the normal peacetime requirements of time, declaration of intention, and so forth...." See Statements in Executive Session on S. 2208 (Second War Powers Act), Senate Committee on the Judiciary, January 19, 1942. More importantly, for present purposes, non-citizen servicemen were excused from the requirement that they be naturalized by courts in the United States. Congress provided that they may be naturalized outside the United States before any representative of the INS designated for that purpose by the Attorney General. 1940 Act, Sec. 702. As Oscar Cox, General Counsel, Office for Emergency Management, explained to the Senate Committee on the Judiciary, the goal was to enable qualified servicemen to "be naturalized right at the camps instead of having to go great distances to the particular courts that now have the power to naturalize." Statements in Executive Session on S. 2208, Second War Powers Act, Senate Committee on the Judiciary, January 19, 1942 at 29. A provision comparable to Sec. 701 had been in effect during World War I. "The only new feature of this, from [World War I], really, is the one that they can be naturalized without having to appear before the court.... [The lack of such a feature in World War I] caused a great deal of difficulty." Id. at 30.
 
 
 4
 In August 1945, two months after the liberation of the Philippine Islands, the Immigration and Naturalization Service (INS), designated our Vice Consul in Manila, George Ennis, to naturalize military personnel under the 1940 Act. Officials of the Philippines, anticipating their independence on July 4, 1946, soon expressed concern that their newly emerging nation would suffer a manpower drain if Filipinos who served in our military forces were free to apply for American citizenship under the liberalized terms of the 1940 Act. In response to these expressions of concern from Philippine officials, the Attorney General, in October 1945, closed the window of opportunity on these Filipino servicemen by revoking Vice Consul Ennis's naturalization authority. Later that year, Congress provided that World War II veterans would have until December 31, 1946 to petition for naturalization under the relaxed wartime standards of the 1940 Act. This extension, however, was of little value to Filipino war veterans because the Attorney General did not restore naturalization authority in the Philippines until August 1946--four months before the statutory cut-off date.
 
 
 5
 The Attorney General's revocation of Mr. Ennis's naturalization authority in 1945 has spawned extensive litigation over the rights of Filipinos who served in our military forces in World War II. See, e.g., INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); Mendoza v. United States, 672 F.2d 1320 (9th Cir.1982), vacated and remanded, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); Olegario v. United States, 629 F.2d 204 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); In re Naturalization of 68 Filipino War Veterans, 406 F.Supp. 931 (N.D.Cal.1975). Because the background and history of this litigation is accurately chronicled in Olegario, 629 F.2d at 207-16, we need not repeat it in detail. Instead, we turn directly to the naturalization petitions of the 15 Filipino veterans now before us.
 
 B
 
 6
 Case No. 80-4543 involves the consolidated appeals of 14 Filipino veterans whose naturalization petitions were denied by the district court on the ground that they were filed after the December 31, 1946 statutory deadline. The INS has stipulated that all 14 qualify as Category II veterans under the classification system adopted by Judge Renfrew in In re Naturalization of 68 Filipino War Veterans, 406 F.Supp. 931 (N.D.Cal.1975) (68 Filipinos ). Judge Renfrew divided the 68 petitioners involved into three categories. Category I consisted of those veterans who had taken some affirmative steps to be naturalized before the December 31, 1946 statutory cut-off date.[1] Category II consisted of Filipino veterans who were eligible for naturalization under the 1940 Act and present in the Philippines during the period from October 1945 to August 1946, but who had not taken affirmative steps to be naturalized before December 31, 1946. Judge Renfrew held that Category II veterans were entitled to citizenship because the Attorney General's revocation of Vice Consul Ennis's naturalization authority deprived the Filipino veterans equal protection of the laws as guaranteed by the Due Process Clause of the Fifth Amendment.[2] Finally, Category III veterans were those who could not prove that they had been eligible for naturalization under the 1940 Act. Id. at 936-37, 951.
 
 
 7
 Case No. 81-5427, involves a single petitioner, Mario Valderrama Litonjua whose petition for naturalization was also denied by the district court on the ground that it was filed after the December 31, 1946 statutory deadline. In contrast to its position in Case No. 80-4543, the INS disputes Litonjua's claim that he qualifies as a Category II veteran. Litonjua enlisted in the United States Navy in 1941 and became a prisoner of war in 1942. After his release from a Japanese prison camp in early 1945, he rejoined his unit in the Philippines where he remained on active duty until he was honorably discharged on April 10, 1946. Thus, Litonjua was in the Philippines and eligible to be naturalized under the 1940 Act during the month period when the Attorney General withheld naturalization authority from the Philippines.
 
 
 8
 The INS did not challenge Litonjua's status as a Category II veteran in its briefs. It asserted for the first time in oral argument that Litonjua does not qualify as a Category II veteran because he sought naturalization in Seattle, Washington after his discharge.[3] We reject this argument because we fail to see any valid reason for denying Litonjua Category II status simply because he tried to apply for naturalization in this country after his discharge. We hold that Litonjua fits into Category II because he was an eligible serviceman stationed in the Philippines during the nine-month period when the Attorney General denied Filipinos the opportunity to seek naturalization under the 1940 Act. See 68 Filipinos, 406 F.Supp. at 936-37.
 
 
 9
 In sum, Litonjua, Pangilinan and the other 13 petitioners whose appeals are before us are Category II veterans. They were stationed in the Philippines during the nine-month period when there was no naturalization examiner in the Philippines, and they would have qualified for American citizenship under the 1940 Act had they filed naturalization petitions before the statutory cut-off date of December 31, 1946. Petitioners make two arguments in support of their claim that they are entitled to citizenship notwithstanding the untimeliness of their petitions:[4] (1) that the Attorney General exceeded his authority and contravened the will of Congress when he revoked Vice Consul Ennis's naturalization authority and denied the benefits of the 1940 Act to servicemen stationed in the Philippines for nine months; and (2) that, as ruled by Judge Renfrew in 68 Filipinos, the Attorney General's action denied petitioners equal protection of the laws as guaranteed by the Due Process Clause of the Fifth Amendment. Both arguments are disputed by the INS. In addition, the INS raises four threshold barriers to petitioners' citizenship claims: (1) the Attorney General's order withdrawing naturalization authority from the Philippines raises a political question not subject to judicial review; (2) petitioners are barred from seeking naturalization because of section 310(e) of the Naturalization Act of 1952, 75 Stat. 656, 8 U.S.C. Sec. 1421(e) (1982); (3) the petitions are barred by laches; and (4) petitioners' claims are foreclosed by INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). We will address the INS's threshold points before considering petitioners' statutory and constitutional arguments.[5]II
 
 
 10
 * The INS's contention that the claims of Filipino war veterans to citizenship under the 1940 Act are barred by the political question doctrine has been raised in several prior cases. The INS relies upon an unpublished district court decision. See In re Naturalization Petition of Inton, No. SA-79-CA-284 (E.D.Tex. July, 3, 1980). In contrast, both Judge Renfrew in 68 Filipinos, 406 F.Supp. at 943-48, and the Second Circuit in Olegario, 629 F.2d at 216-19, held that the claims of Filipino war veterans based upon the Attorney General's revocation of Vice Consul Ennis's naturalization authority are justiciable.
 
 
 11
 We find the reasoning of both Judge Renfrew and the Second Circuit to be persuasive. In rejecting the government's political question argument, Judge Renfrew applied the six-pronged test of Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Noting that not all cases touching upon foreign affairs are nonjusticiable, 406 F.Supp. at 945, he reasoned that the judicial standards of equal protection and due process are well-developed; that Congress had established the relevant policy in the 1940 Act, leaving no "initial policy determination of a kind clearly for nonjudicial discretion," id. at 946 (quoting Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710); that because it was unlikely that the foreign policy of the United States would be affected by the court's consideration of the merits of the case, there was no special need for unquestioning adherence to a political decision already made, id. at 947; and that there was little likelihood that "multifarious pronouncements by various departments on one question" would embarrass the United States. Id. at 945-47.
 
 
 12
 In Olegario, the Second Circuit agreed with Judge Renfrew's analysis. 629 F.2d at 216-19. So do we.[6] As the Supreme Court said in Baker v. Carr, "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit,' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." 369 U.S. at 217, 82 S.Ct. at 710. At their core, the Filipino war veterans' claims to citizenship raise questions of individual rights allegedly denied through unauthorized and unconstitutional action by the executive branch. We hold that the questions raised by petitioners are justiciable, not "political."
 
 B
 
 13
 The INS's second threshold contention is that the citizenship claims of the Filipino war veterans are barred by section 310(e) of the 1952 Immigration and Nationality Act, 75 Stat. 656, 8 U.S.C. Sec. 1421(e) (1961). Section 310(e) was enacted in 1961 in response to several judicial decisions that had broadly construed the savings clause of the Immigration and Nationality Act of 1952 Sec. 405(b), Pub.L. No. 82-414, 66 Stat. 242, to permit naturalization petitions to be filed under either the 1940 Act or the 1952 Act. See 1961 U.S.Code Cong & Ad.News, at 2950, 2981-82. Section 310(e) explicitly required that all naturalization petitions be filed under the 1952 Act, thereby closing the option of petitioning under the less stringent requirements of the 1940 Act. See Olegario, 629 F.2d at 211-12.
 
 
 14
 The INS argues that Section 310(e) bars Filipino war veterans from applying for naturalization under Section 701 of the 1940 Act. We disagree. While it is true that in enacting section 310(e) in 1961, Congress clearly intended to foreclose future petitions under the 1940 Act, there is no basis in logic or precedent for concluding that Congress intended to foreclose Filipino war veterans from litigating claims that the executive branch had denied them statutory and constitutional rights in closing off their opportunity to petition for naturalization under the 1940 Act. As the Second Circuit said in also rejecting the INS's section 310(e) argument, "[w]hile Congress may repeal a statute, or amend it in response to judicial interpretations, such legislation does not automatically cut off the rights of those persons who are unconstitutionally deprived of statutory benefits to which they were previously entitled." Olegario, 629 F.2d at 220.[7]
 
 C
 
 15
 The INS's argument that the war veterans' claims are barred by laches is easily disposed of. Once again, we agree with the Second Circuit in Olegario that the government has made no showing that it has been prejudiced by any lack of diligence on the part of the veterans in pursuing their claims. Id. at 221-22.
 
 D
 
 16
 The INS's fourth and final threshold argument is that judicial relief in these cases is foreclosed by the Supreme Court's decision in INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). Once again, we join both Judge Renfrew in 68 Filipinos, 406 F.Supp. at 942-43, and the Second Circuit in Olegario, 629 F.2d at 221, in rejecting this argument. In Hibi, the Court held that the government's failure to advise a Filipino war veteran of his rights under the 1940 Act and to station a naturalization officer in the Philippines during 1945-46 did not rise to the level of affirmative misconduct sufficient to invoke the doctrine of equitable estoppel against the United States. In the cases now before us, however, petitioners do not rely upon the doctrine of equitable estoppel. Rather they raise statutory and constitutional arguments neither presented to nor addressed by the Supreme Court in Hibi. Accordingly the doctrine of stare decisis is inapplicable.
 
 III
 
 17
 We now address the merits of petitioners' statutory claim: that the Attorney General acted in excess of his authority and in contravention of the will of Congress when he withheld naturalization authority from the Philippines for the nine-month period from October 1945 to August 1946.
 
 
 18
 * In enacting the Second War Powers Act of 1942, Congress clearly intended to provide for overseas naturalization of non-citizen military personnel under the 1940 Act. See page 1093 supra. It is equally clear that Congress intended to afford the Attorney General a measure of authority in implementing this statutory mandate. Section 705 of the 1940 Act provides that "[t]he Commissioner, with the approval of the Attorney General, shall prescribe and furnish such forms, and shall make such rules and regulations as may be necessary to carry into effect the provisions of this Act."
 
 
 19
 The INS argues that the authority granted to the Attorney General by Section 705 includes the discretion to decide when and where to make the benefits of the 1940 Act available to eligible servicemen:
 
 
 20
 Surely the 1940 Act did not require the Commissioner and the Attorney General to naturalize every alien eligible under Sections 701 and 702 of the 1940 Act, or require that a naturalization examiner be stationed in each and every area where an eligible serviceman may be found. Congress in passing Sections 701 and 702 of the 1940 Act surely did not mean to require the Commissioner and the Attorney General to post naturalization examiners in the Philippines during the Japanese occupation, even though there were eligible aliens present in the Philippines during that time. While the rotation system--whereby naturalization examiners traveled from post-to-post, spending only a short period of time in each--adopted by the Commissioner and the Attorney General undoubtedly prevented some qualified aliens from applying for naturalization, the control and deployment of the naturalization examiners was a proper exercise of executive power, and did not contravene Sections 701 and 702 of the 1940 Act. This is also true with respect to stationing examiners in the Philippines.
 
 
 21
 Brief for Appellee at 12.
 
 
 22
 We are astonished that the INS, in resisting citizenship for these Filipino war veterans, would resort to the argument that Congress surely did not intend to send civilian naturalization examiners into enemy-held territory. Of course Congress could not have so intended. But here we are dealing with post-war Manila, not enemy-held territory. The issue before us is whether Congress intended to authorize the Attorney General to deny a class of eligible servicemen--in this case Filipinos--the benefits of the Act solely on the basis of domestic concerns voiced by prospective members of the government of the soon-to-be-independent Philippines. The INS's argument about naturalization examiners in the Philippines during the Japanese occupation is patently irrelevant.
 
 
 23
 We also find the INS's argument about the Attorney General's discretion to rotate naturalization officers "from post-to-post" to be wide of the mark. No one could seriously contend that Congress mandated the Attorney General to make naturalization examiners continuously available to alien servicemen wherever they may be stationed. But that is beside the point. Manila was hardly a military outpost, and the Attorney General did not revoke Vice Consul Ennis's naturalization authority as part of a program of rotating naturalization examiners from post to post. Nor did he revoke that authority because of the unavailability of American civilians such as George Ennis to serve as naturalization examiners in Manila. Indeed, there is no indication that Mr. Ennis stopped serving as Vice Consul in Manila when his naturalization authority was revoked. Hence we reject the INS's attempt to justify the withdrawal of naturalization authority from the Philippines as though it were an exercise in rotating limited personnel to different military posts.
 
 B
 
 24
 The second prong of the INS's statutory interpretation argument is based upon the inherent powers of the executive branch in the field of foreign affairs. While acknowledging that the statute and the legislative history are silent on the issue, the INS argues that Congress implicitly delegated to the Attorney General the discretion to selectively deny the benefits of the 1940 Act on foreign policy grounds.[8] In essence, the INS argues that when Congress in 1942 offered naturalization on generous terms to aliens who served in our military forces, the offer carried an implied condition: it could be unilaterally revoked by the Attorney General in response to post-war domestic concerns expressed by foreign officials.
 
 
 25
 Beyond reciting the platitude that the executive has broad authority in the field of foreign affairs, see, e.g., Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the INS fails to develop the argument that it was the implied will of Congress to cloak the Attorney General with inherent authority to deny Filipino servicemen the benefits of the 1940 Act in response to the manpower concerns expressed by Philippine officials.[9] The INS fails, for example, to apply the analysis of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), to the decision of the Attorney General overriding the will of Congress that alien servicemen who qualified under the Act be "naturalized right at the camps" overseas. See page 1093, supra.
 
 
 26
 In Youngstown, Justice Jackson provided a tripartite analytical framework for evaluating claims of executive authority. The authority of the executive, he wrote, would vary according to the nature and extent of Congressional action and authority in the area. Id. 343 U.S. at 635, 72 S.Ct. at 870 (Jackson, J., concurring). Thus, executive authority is at its zenith and the executive "may be said ... to personify the federal sovereignty" when the executive action is either expressly or implicitly authorized by Congress. Id. at 635-36, 72 S.Ct. at 870 (Jackson, J., concurring); see, e.g., Dames & Moore v. Regan, 453 U.S. 654, 668-69, 101 S.Ct. 2972, 2980-81, 69 L.Ed.2d 918 (1981) (executive authority to suspend claims against Iran pending in federal courts upheld because of Congressional acquiescence in settled practice of executive to settle claims between American citizens and foreign governments). Conversely,
 
 
 27
 When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional power of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.
 
 
 28
 343 U.S. at 637-38, 72 S.Ct. at 871 (Jackson, J., concurring).
 
 
 29
 In the instant cases, there is little room for doubt that the Attorney General's revocation of Vice Consul Ennis's authority was "incompatible with the expressed will of Congress." Id; see INS v. Miranda, 459 U.S. 14, 18, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (the Attorney General's "error was clear" when he revoked Ennis's authority in 1945). In clear and unambiguous terms Congress provided (1) that non-citizens (Filipinos, in this case) who served honorably in the military forces of the United States during World War II may be naturalized if they met liberalized standards, Sec. 701; (2) that any such person serving abroad may be naturalized outside of the United States, Sec. 702; (3) that the petitions of such persons serving abroad "shall be made and ... filed with, a representative of the Immigration and Naturalization Service designated by the Commissioner," id. (emphasis added); and (4) that the "Commissioner, with the approval of the Attorney General, shall prescribe and furnish such forms, and shall make such rules and regulations as may be necessary to carry into effect the provisions of this Act." Sec. 705 (emphasis added).
 
 
 30
 Thus the language of the statute is clear. It contains no express or implied delegation of authority to the Attorney General[10] to deny the benefits of the Act to eligible aliens for any reason. Congress used language that was mandatory, not discretionary. It spoke, for example, of representatives "designated" to process naturalization petitions overseas, not representatives who "may be designated." Sec. 702. It mandated that the Commissioner, with the approval of the Attorney General, "shall" (not may) prescribe and furnish such forms, and "shall" (not may) make such rules and regulations as may be necessary "to carry into effect" the provisions of this Act. Sec. 705.
 
 
 31
 Thus, in Justice Jackson's language, the Attorney General's withdrawal of naturalization authority from the Philippines was "incompatible with the expressed will of Congress" and executive authority was, therefore, "at its lowest ebb." Youngstown, 343 U.S. at 637-38, 72 S.Ct. at 871 (Jackson, J. concurring). Accordingly, we reject the executive branch's claim that its inherent power over foreign affairs is so pervasive that we should disregard the expressed will of Congress and find an implied intent to defer to the Attorney General's judgment that benefits under the Act should be withheld from Filipinos in response to postwar manpower concerns expressed by Philippine officials.
 
 
 32
 We are especially reluctant to find an implied congressional intent to delegate such wide discretion to the executive branch in the field of naturalization. Under the Constitution, U.S. Const. Art. I, Sec. 8, cl. 4, the power of Congress over immigration and naturalization is virtually plenary. See Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) ("over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens"). Although Congress has at times demonstrated a willingness to delegate broad discretionary authority to the Attorney General in the field of immigration and naturalization,[11] it did not do so in Sec. 705 of the 1940 Act. Further, in arguing that the revocation of Vice Consul Ennis's naturalization authority implicated concerns of diplomacy best left to the discretion of the executive,[12] the INS ignores the fact that in 1945 the Philippines was a territory of the United States and that the Constitution expressly delegated power to regulate American territory to the Congress, not to the executive branch. U.S. Const., Art. IV, Sec. 3 cl. 2. Moreover, the imperative cited by the INS--avoiding a drain on Philippine manpower--is belied by the fact that during the time the Attorney General withheld naturalization authority from the Philippines, Congress was recruiting, with "the approval of" Philippine authorities, 50,000 Philippine residents into the postwar United States occupation forces. Act of October 6, 1945, Pub.L. 79-190, Sec. 14, 59 Stat. 543.[13]
 
 
 33
 Finally, it is hard to believe that Congress intended to license the Attorney General to deny the benefits of the 1940 Act to Filipinos as a class.[14] The legislative history of the Second War Powers Act of 1942 demonstrates that Congress intended to assure "that aliens honorably serving in our armed forces during the present war may acquire citizenship regardless of race, age, length of service, and education." See S.Rep. Written Statement of Attorney General Biddle on the Second War Powers Bill (emphasis added). Thus the Attorney General was expected to carry out the mandate of Congress in an even-handed, non-discriminatory manner. That the Attorney General failed to do so when he stripped the Philippines of naturalization authority cannot be denied. Indeed, Judge Renfrew decided that the Attorney General's action was so discriminatory that it deprived eligible Filipinos of the equal protection of the laws guaranteed by the Fifth Amendment of the Constitution. 68 Filipinos, 406 F.Supp. at 948-49.
 
 
 34
 In sum, we believe that the Congress of 1942, preoccupied with the war effort and our nation's honor, would have been appalled at the notion that its generous offer of citizenship for alien servicemen was freely terminable at the discretion of the Attorney General, especially on a discriminatory basis. As the Supreme Court has said in a similar context,
 
 
 35
 [We] hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose.... [W]hen a precious right is granted, we will construe narrowly all delegated powers that curtail or dilute it."
 
 
 36
 Kent v. Dulles, 357 U.S. 116, 128-29, 78 S.Ct. 1113, 1119-20, 2 L.Ed.2d 1204 (1958). Clearly the right to citizenship is even more precious than the right to a passport. Thus we cannot accept the INS's argument that we should read into the 1940 Act a broad grant of implied authority to curtail the benefits of the Act to eligible servicemen. Because a "precious right" was granted by the 1940 Act, we must construe the authority granted to the Attorney General narrowly. Id.
 
 
 37
 In rejecting the INS's expansive interpretation of the 1940 Act, we not only vindicate the right to citizenship claimed by the Filipino war veterans who qualified for citizenship under the Act; we also avoid deciding this substantial constitutional question. We thus observe the teaching of the Supreme Court that a statute is "to be construed, if such a construction is possible, to avoid raising doubts about its constitutionality." St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1980). Judge Renfrew's decision in 68 Filipinos that the Attorney General's action denied Filipino war veterans the equal protection of the laws in violation of the Fifth Amendment attests to the seriousness of the constitutional problem we would confront if we accepted the INS's view of the Attorney General's authority under the statute.C
 
 
 38
 We recognize that our decision that the Attorney General exceeded his statutory authority and thwarted the will of Congress when he revoked Vice Consul Ennis's naturalization authority brings us into conflict with the Second Circuit in Olegario. While acknowledging that the Attorney General "did not have unbridled discretion" in implementing the 1940 Act, 629 F.2d at 226, and that the "unilateral" withdrawal of naturalization authority from the Philippines temporarily frustrated Congress's immediate objective in extending its offer of citizenship to members of our military forces, id., the Second Circuit found an "implicit intent" on the part of Congress to grant the Attorney General authority to "consider the foreign affairs ramifications of a particular mode of enforcement and to suspend implementation to avoid a confrontation." Id. With all respect, we find the Second Circuit's analysis in Olegario to be unpersuasive. Moreover, the Second Circuit decided Olegario before the Supreme Court stated in INS v. Miranda, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982), that the Attorney General's "error was clear" when he revoked Vice Consul Ennis's naturalization authority in 1945. Id. at 18, 103 S.Ct. at 283.[15]
 
 CONCLUSION
 
 39
 We hold that, in creating "the rather anomalous situation that while we recognize in law the legal right of these persons to the benefits under the [1940] Act we have, from an administrative standpoint, made it impossible for such persons to acquire these benefits,"[16] the Attorney General acted beyond the bounds of his authority to "carry into effect the provisions of [the 1940 Act]." 1940 Act, Sec. 705. The remaining question before us is whether the federal judiciary has the authority to remedy the Attorney General's transgression by granting the relief sought by the Filipino war veterans--American citizenship notwithstanding the untimeliness of their naturalization petitions under the 1940 Act.[17]
 
 
 40
 In reviewing naturalization petitions, federal courts sit as courts of equity. Fedorenko v. United States, 449 U.S. 490, 516-18, 101 S.Ct. 737, 752-53, 66 L.Ed.2d 686 (1980). When reviewing agency action, a federal court has broad remedial powers and may "adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." Legal Aid Society of Alameda County v. Brennan, 608 F.2d 1319, 1342 (9th Cir.1979) (quoting Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939)); see also Harper v. Levi, 520 F.2d 53, 60 (9th Cir.1975) ("courts are empowered to rectify agency action erroneously taken...."). "The essence of equity jurisdiction," as Justice Douglas wrote,
 
 
 41
 has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.
 
 
 42
 Hecht Co. v. Bowles, 321 U.S. 321, 329-30, 64 S.Ct. 587, 591-92, 88 L.Ed. 754 (1944); see also Lemon v. Kurtzman, 411 U.S. 192, 200-01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972) ("equitable remedies are a special blend of what is necessary, what is fair, and what is workable.... In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests...."); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 12, 91 S.Ct. 1267, 1274, 28 L.Ed.2d 554 (1970) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); Graves v. Romney, 502 F.2d 1062, 1064 (8th Cir.1974) ("The goal of equitable relief ... is to restore the plaintiff to the enjoyment of the right which has been interfered with to the fullest extent possible ...."), cert. denied, 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 440 (1975).
 
 
 43
 Notwithstanding these deep-rooted precepts of equity, the INS argues that we have no authority to redress the error of the Attorney General in withdrawing naturalization authority from the Philippines by granting the naturalization petitions of war veterans who were stationed there at the time. The INS would have us limit our equitable remedies to the restoration of naturalization authority in the Philippines, which would be an empty gesture at this late date. We reject this invitation to render impotent the federal judiciary's traditional powers of equity. Rather we grant the only effective remedy available to "rectify the agency action taken," Harper v. Levi, 520 F.2d at 60: granting citizenship to the 15 Filipino war veterans whose naturalization petitions are now before us. There is simply no other way to restore the lost opportunity for citizenship that Congress offered them as a just reward for their military service in World War II.
 
 As Judge Renfrew wrote in 68 Filipinos:
 
 44
 [T]he Court cannot ignore, nor will the American public forget, the heroic sacrifices made by these and other Filipinos during World War II. Their courage and valor at Corregidor, during the Bataan death march, and throughout the Japanese occupation of the Philippine Islands stand as the finest examples of the dedication of free men opposing and resisting tyranny imposed upon them by an outside belligerent force. Petitioners' love of freedom and dedicated defense of this country during time of war truly show that "[l]oyalty is a matter of the heart and mind, not of race, creed, or color." Ex parte Endo, 323 U.S. 283, 302, 65 S.Ct. 208, 218, 89 L.Ed. 243 (1944).
 
 
 45
 68 Filipinos, 406 F.Supp. at 951.
 
 
 46
 The district court orders denying these petitions for naturalization are reversed. The cases are remanded for the entry of orders naturalizing the 15 Filipino war veterans whose petitions are before us in these appeals.
 
 
 47
 REVERSED and REMANDED.
 
 
 
 [1]
 Judge Renfrew conferred citizenship on all Category I veterans on the ground that they had been victims of "affirmative misconduct" because the INS had actively discouraged them from seeking naturalization while they were stationed in the Philippines. Id. at 938-39
 
 
 [2]
 Judge Renfrew rejected the government's argument that the Due Process clause was not applicable to the Filipino war veterans because they were not citizens. Upon reviewing the Philippine Independence Act, and the Immigration and Nationality Act, he concluded that Filipinos were nationals of the United States until July 4, 1946, when the Islands became fully independent. 406 F.Supp. at 941. Furthermore, according to Judge Renfrew, the Philippine Independence Act "evidence[d] an unmistakeable Congressional intent to preserve for Filipinos basic civil rights." Id. at 942. Judge Renfrew thus observed that "it would be anomalous" to afford less constitutional protection to Filipino war veteran than the extensive protections "enjoyed by [transients] of foreign nationality," 406 F.Supp. at 950, and held that their rights were coextensive with those of other noncitizen residents of the United States. Id. at 949-50. In his view the government failed to show a compelling state interest justifying the withdrawal of naturalization authority which discriminated against Filipinos, an inherently suspect class. Id
 
 
 [3]
 Litonjua responds that his attempt to be naturalized in Seattle qualifies him for Category I status. Because we hold he is entitled to citizenship as a Category II veteran, we need not reach his claim to Category I status
 
 
 [4]
 Petitioners originally advanced a third argument in support of their claims to citizenship: that the judgment in 68 Filipinos collaterally estops the government from denying citizenship to Category II veterans. Relying upon Mendoza v. United States, 672 F.2d 1320 (9th Cir.1982), vacated and remanded, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), we upheld petitioners' collateral estoppel claim. Barretto v. United States, 694 F.2d 603 (9th Cir.1982). After the Supreme Court reversed Mendoza on the collateral estoppel ground, it vacated and remanded the Litonjua and Pangilinan cases to us for further consideration. INS v. Litonjua, 465 U.S. 1001, 104 S.Ct. 990, 79 L.Ed.2d 224 (1984)
 
 
 [5]
 All questions presented by these appeals are pure questions of law reviewable de novo. United States v. McConney, 728 F.2d 1195, 1200 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1985)
 
 
 [6]
 We also agree with the Second Circuit's rejection of an INS argument raised that in applying the political question doctrine, courts must "assume a historical perspective and determine whether [petitioner's] claim would have been entertained in 1945". 629 F.2d at 218. Rather, courts apply the doctrine to the political conditions existing at the time the case is litigated. Id
 
 
 [7]
 We also agree with the Second Circuit that nothing in this Circuit's opinion in United States v. Pasion, 524 F.2d 249 (9th Cir.1975), precludes our granting naturalization under the 1940 Act. See Olegario, 629 F.2d at 222. Petitioner in that case made no allegation that he had been denied the opportunity to apply under the 1940 Act because of unauthorized or unconstitutional action by the executive branch. Pasion merely claimed that he qualified for naturalization under the terms of the 1940 Act, a claim that after September 26, 1961, was clearly foreclosed by section 310(e). 524 F.2d at 252
 
 
 [8]
 The INS does not make the corollary argument that the executive had the inherent power to revoke Vice Consul Ennis's authority for foreign policy reasons independent of the statutory authority granted to the Attorney General by Sec. 705
 
 
 [9]
 The INS relies upon Haig v. Agee, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), and Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), a reliance that is misplaced. In Agee, the issue was whether the Secretary of State exceeded his powers by revoking Agee's passport on the ground that Agee's conduct abroad was endangering national security and interfering with the nation's foreign relations. Although the Passport Act of 1926 did not expressly authorize the Secretary's action, the Court upheld the revocation of Agee's passport because the Court found a long history of authority to revoke passports on national security grounds. A similar pattern of congressional acquiescence was found in Dames & Moore, wherein the Supreme Court upheld an administration order which, among other things, suspended claims of American citizens then pending in the federal courts in suits against the Government of Iran. Although Congress had not expressly authorized such an order, the Court noted that Congress had implicitly approved it because of its acquiescence in a long-standing practice of the executive to settle claims between American citizens and foreign governments. In contrast to Agee and Dames & Moore, there has been no pattern of congressional acquiescence in the Attorney General's refusal to carry out a benevolent naturalization law on the basis of domestic concerns voiced by members of a nascent foreign government
 
 
 [10]
 Except where otherwise indicated, the term "Attorney General" is used throughout this opinion to refer to both the Attorney General and the Commissioner of the Immigration and Naturalization Service
 
 
 [11]
 See, e.g., 8 U.S.C. Sec. 1158(a) (1982) (Attorney General given discretion to deny asylum even when an alien has established statutory eligibility)
 
 
 [12]
 We need not decide whether Congress would have intended to defer to the foreign policy judgment of the President, as distinguished from the Attorney General. See Hampton v. Mow Sun Wong, 426 U.S. 88, 114, 96 S.Ct. 1895, 1910, 48 L.Ed.2d 495 (1975) (recognizing the distinction between the exercise of the executive power by the President and by other members of the executive branch). While we do not question the authority of the President to exercise his inherent powers in foreign affairs through executive agencies other than the State Department, the INS does not contend that anyone with responsibility for foreign affairs participated in the Attorney General's decision to revoke Vice Consul Ennis' naturalization authority
 
 
 [13]
 Those enlistments, petitioners cogently argue, would constitute as much of a drain on Philippine manpower as would the naturalization of Filipinos who served in World War II
 
 
 [14]
 It is particularly hard to believe that Congress would have tolerated discrimination against Filipinos. In 1942, when Congress offered aliens the opportunity for citizenship in exchange for military service, the Philippines was not only strategically located in the heart of the Pacific Theatre, it also provided a reservoir of manpower far greater than all other United States territories and possessions combined. Our territories and possessions, and their respective populations in 1940, were as follows:
 Commonwealth of the Philippines -- 16,356,000
Puerto Rico -- 1,869,254
Hawaii -- 423,330
Alaska -- 72,524
Panama Canal Zone -- 51,827
Virgin Islands -- 24,889
Guam -- 22,290
Samoa -- 12,908
 Statistical Abstract for 1940.
 
 
 [15]
 In Miranda, which was decided after Olegario, the Court held that the INS' unexplained 18-month delay in processing a visa application was not affirmative misconduct that estopped the INS from denying the application. The Court found that the 18-month delay in processing the visa application provided a weaker case of affirmative misconduct than the Attorney General's revocation of Ennis' naturalization authority because "[u]nlike Hibi, where the Government's error was clear, the evidence that the Government failed to fulfill its duty in this case [Miranda ] is at best questionable." Miranda, 459 U.S. at 18, 103 S.Ct. at 283 (emphasis added)
 
 
 [16]
 Memorandum from Edward J. Shaughnessy, Special Assistant to the Commissioner of the INS, to Ugo Carusi, Commissioner, INS (October 19, 1945). See Olegario, 629 F.2d at 210; 68 Filipinos, 406 F.Supp. at 936 n. 6
 
 
 [17]
 As Category II veterans, all 15 appellants in the instant cases were stationed in the Philippines during the nine-month period that naturalization authority was withdrawn, and all qualified for citizenship under the 1940 Act. See page 1095, supra