**Re Naturalization of Antolin Punsalan PANGILINAN, et al., Petitioners-Appellants,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.**

**Re Naturalization of Mario Valderrama LITONJUA, Petitioner-Appellant,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.**

**Nos. 80–4543, 81–5427.**

United States Court of Appeals, Ninth Circuit.

Feb. 13, 1987.

Simmons & Ungar and Donald I. Ungar, San Francisco, Cal., Baxley and Mautino and Robert A. Mautino, San Diego, Cal., for the petitioners-appellants.

Lauri Steven Filppu, John T. Bannon, Jr., Marshall Tamor Golding and Frank O. Bowman, III, Washington, D.C., for the respondent-appellee.

Before SCHROEDER, FLETCHER and NORRIS, Circuit Judges.

## ORDER

The panel, as constituted above, has unanimously voted to deny the petition for rehearing and to reject the suggestion for a rehearing en banc.

The full court has been advised of the suggestion for en banc rehearing and upon the vote of the eligible judges in active service, a majority failed to vote for en banc rehearing.

The petition for rehearing is DENIED, and the suggestion for a rehearing en banc is REJECTED.

KOZINSKI, Circuit Judge, with whom Circuit Judges SNEED, KENNEDY, ANDERSON, HALL, WIGGINS, THOMPSON and O'SCANNLAIN join, dissenting from the order rejecting the suggestion for rehearing en banc.

No doubt moved by what it sees as an injustice, the panel in this case has granted United States citizenship to the petitioners under a statute that expired over 40 years ago. While the panel may have acted from the noblest of motives, its opinion disregards the clear teachings of the Supreme Court in *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), and on a separate issue creates a square and irreconcilable conflict with the opinion of the Second Circuit in *Olegario v. United States,* 629 F.2d 204 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). It also misconstrues the function of the federal courts in naturalization proceedings, seriously overstates their equity power and unsettles established law as to congressionally mandated time limitations. The court today bypasses the opportunity to correct this constellation of errors.

## I.

Petitioners are Filipino nationals who served in the armed forces of the United States during World War II. Pursuant to the Nationality Act of 1940, Pub. L. No. 76–853, 54 Stat. 1137 (1940), as amended by the Second War Powers Act, Pub.L. No. 77–0507, § 1001, 56 Stat. 182 (1942) (the Act or the 1940 Act), they were entitled to apply for U.S. citizenship under greatly liberalized conditions. The time to apply under the 1940 Act expired on December 31, 1946. None of the petitioners applied for citizenship within the time allowed.

The panel hearing this case nevertheless granted petitioners citizenship. The panel divined authority for this unusual action from the court's equity powers, justifying it as "the only effective remedy available" to rectify an "error" the Attorney General supposedly committed some 40 years ago. 796 F.2d 1091, 1103. This "error" was the Attorney General's failure to station an officer with naturalization authority in the Philippines during a nine-month period from October 1945 to August 1946. The Attorney General's action had come in response to concerns expressed to our State Department by the nascent Philippine government that a vigorous naturalization program on Philippine soil might result in a mass exodus of the new country's best young men.

## II.

### A. *Conflict with the Second Circuit*

The opinion's fulcrum is its determination that, by not stationing an immigration examiner in the Philippines for those nine months, "the Attorney General [denied] a class of eligible servicemen—in this case Filipinos—the benefits of the Act." 796 F.2d at 1098. But the Act did not give Filipino servicemen a right to citizenship. As the Second Circuit concluded in *Olegario,* "[a]t most, the statute provided [them] with *an opportunity* to become ... citizen[s]." *Olegario,* 629 F.2d at 224 (emphasis added).

The Act gave the INS and the Attorney General considerable discretion in implementing the naturalization program. 1940 Act §§ 702–03. The question is whether the Attorney General abused this discretion in responding to the concerns of the soon-to-be-independent Philippine government. The Second Circuit carefully considered the question and concluded that he had not:

The executive decision at issue here was thus based on policy considerations traditionally, although not exclusively, associated with the executive branch. The authority granted to the Commissioner and the Attorney General, to implement the Act without specific guidelines or restrictions, was sufficient to permit the executive to exercise some discretion when confronted with a seemingly delicate foreign affairs matter.... The decision to withdraw the naturalization examiner from the Philippines was not clearly beyond the limits of the Attorney General's discretion or contrary to Congress's vision of the executive's role in implementing the Act.

629 F.2d at 227. *See also id.* at 228 ("[t]he decision to withdraw all naturalization authority from the Philippine Islands for a nine month period was not a manifest abuse of ... discretion").

Our panel's contrary conclusion is based on its assertion that "there is little room for doubt that the Attorney General's revocation of ... authority [to perform naturalizations in the Philippines] was 'incompatible with the expressed will of Congress.'" 796 F.2d at 1099 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)). The panel errs; there is plenty of room for doubt.

Section 702 of the Act speaks in mandatory terms only in describing the steps the naturalization petitioner must take in applying for citizenship: "The petition for naturalization of any petitioner under this section shall be made and sworn to before, and filed with, a representative of the Immigration and Naturalization Service designated by the Commissioner or a Deputy Commissioner...." 1940 Act § 702. In all other respects the statute speaks in the permissive, leaving it to the "Commissioner, with the approval of the Attorney General," to establish the procedures for implementing the Act. *Id.* § 705.

The panel's conclusion that the Attorney General's action was contrary to the will of Congress, and therefore represented the "lowest ebb" of executive power, is simply wrong. Nothing in the Act compelled the Attorney General to place immigration examiners in any one place at any one time. The panel's focus on snippets from the statute, generously punctuated with emphasis, 796 F.2d 1099–1100, cannot nullify the very broad discretion that the statute gave the Attorney General in implementing the naturalization program. So long as he acted out of a proper motive, and foreign relations surely is a proper concern of the executive branch, "[t]he decision to withdraw the naturalization examiner from the Philippines was not clearly beyond the limits of the Attorney General's discretion or contrary to Congress's vision of the executive's role in implementing the Act." *Olegario*, 629 F.2d at 227.

The panel derives much comfort from a statement in *INS v. Miranda*, 459 U.S. 14, 18, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982), that the Attorney General's decision to withdraw naturalization authority from the Philippines was clear error. 796 F.2d at 1099, 1102 & n. 15. But such heavy reliance on a stray remark made by the Court in an unrelated context by way of illustrating an entirely different point is misplaced. It is inconceivable that the Court resolved this important and difficult question in such an off-hand manner in a case where it was not argued, briefed or even at issue.

### B. *Disregard of Controlling Supreme Court Authority*

Some 13 years ago the Supreme Court summarily reversed our ruling that the Attorney General was estopped from denying these Filipino servicemen citizenship. In so doing the Court noted the twin public policies of the 1940 Act:

Here the petitioner has been charged by Congress with administering an Act which both made available benefits of naturalization to persons in respondent's class and established a cutoff date for the claiming of such benefits. *Petitioner, in enforcing the cutoff date established by Congress,* as well as in recognizing claims for the benefits conferred

by the Act, *is enforcing the public policy established by Congress.*

*Hibi,* 414 U.S. at 8, 94 S.Ct. at 21 (emphasis added). *Hibi* concluded that the Attorney General's withdrawal of naturalization authority from the Philippines did not amount to affirmative misconduct; it therefore held that the government could not be equitably estopped from enforcing the congressional policy embodied in the Act's expiration date.

The panel's decision here uses somewhat different language but the result it reaches is precisely that rejected by the Supreme Court in *Hibi:* There is no meaningful difference between saying that the government is equitably estopped from raising the statutory cutoff date and disregarding the cutoff date as a matter of equity. The panel substitutes words for concepts.

While the panel seeks to distinguish *Hibi,* unsuccessfully in my view, one aspect of the Court's ruling is beyond cavil: the determination that the December 31, 1946, cutoff date is one of the public policies of the 1940 Act. "[E]quity," wrote Justice Douglas, is "the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). One searches the panel's opinion in vain for weighing, consideration, acknowledgment or even recognition of the "public policy established by Congress" in the December 31, 1946, cutoff date. *Hibi,* 414 U.S. at 8, 94 S.Ct. at 21. If equitable principles are relevant here at all, *but see* pp. 1452–53, *infra,* the panel simply failed to apply them.

### III.

All of that having been said, one might nevertheless be inclined to overlook the panel's errors. The result it reaches is appealing; the fact situation is somewhat unusual; the precise issue may never arise again. There is a strong temptation, therefore, to treat the decision as a sport, unworthy of further thought or concern.

Unfortunately, it is not that simple. There are aspects of the panel's opinion that are far more disturbing even than its disregard of Supreme Court authority or disagreement with a sister circuit. The most fundamental questions raised by the opinion are when the federal courts may invoke the powers of equity and how far they may go when they do so. These issues, tucked away almost as an afterthought in the panel's conclusion, promise to be the opinion's most troublesome aspect, far transcending the case of these Filipino war veterans. What the panel has done goes to the very heart of our jurisprudence and will sow no end of mischief if followed as precedent.

I note first that the panel's exercise of equity powers rests on a fragile foundation. The opinion holds that "[i]n reviewing naturalization petitions, federal courts sit as courts of equity." 796 F.2d at 1102. This categorical assertion treats the issue as settled. In fact, as best I can tell, no other court has ever even considered the question. The panel supports its conclusion with an unadorned citation to *Fedorenko v. United States,* 449 U.S. 490, 516–18, 101 S.Ct. 737, 752–53, 66 L.Ed.2d 686 (1981). That case is not on point.

*Fedorenko* stands for the proposition that "a *de* naturalization action is a suit in equity." *Id.* at 516, 101 S.Ct. at 752 (emphasis added). Despite the similarity in names, naturalization proceedings and denaturalization proceedings are fundamentally different. Denaturalization involves the withdrawal of a right once granted; the exercise of judicial authority, including resort to equitable principles, is necessary and appropriate. Naturalization, on the other hand, is not an inherently judicial function. From time to time, Congress exercises the naturalization power directly by way of private bills or, as in the 1940 Act, vests naturalization authority in officers of the executive branch. By contrast, it is highly unlikely that Congress could constitutionally pass private denaturalization bills or grant executive branch officials final denaturalization authority. *See Vance*

*v. Terrazas,* 444 U.S. 252, 259–60, 100 S.Ct. 540, 544–45, 62 L.Ed.2d 461 (1980) (Congress has no general power to take away American citizen's citizenship without his assent); *Afroyim v. Rusk,* 387 U.S. 253, 257, 87 S.Ct. 1660, 1662, 18 L.Ed.2d 757 (1967) (same). The panel does not explain why, in performing a function that can equally well be performed by officials of the other branches, judges must don the chancellor's robe. While the panel may ultimately be right, this issue of first impression deserves more analysis than an unexplicated citation to a case that does not advance the point.

The question of whether the court is right in invoking its equity powers turns out to be important because of the liberties the panel takes once it deems itself freed from the constraints of a court sitting at law. *See* pp. 1453–55 *infra.* If equity can do all that the panel here says it can, courts must surely be far more cautious in asserting its authority.

Having invoked the powers of equity, the panel proceeds almost directly to its conclusion that it can and must provide the relief petitioners seek. It pauses only to recite a series of platitudes about the broad powers of equity courts. 796 F.2d at 1102–03. But the cases the panel cites stand merely for the unremarkable proposition that *once a right has been established* courts sitting in equity have broad discretion to fashion a remedy. Nothing the panel cites even remotely suggests that equity courts can enforce rights denied by statute.

Contrary to the panel's apparent misapprehension, our equity courts do not dispense " 'equity [which] varies like the Chancellor's foot.' " *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (quoting *Gee v. Pritchard,* 2 Swans. \*403, \*444, 36 Eng. Rep. 670, 674 (1818)). Instead, they must adhere to the established principles that govern their authority. 1 J. Story, *Equity Jurisprudence* 20 (Lyon ed. 1918). One fundamental principle of modern equity jurisprudence is that "[e]quity follows the law." G. McDowell, *Equity & the Consti-*

*tution* 5 (1982). This means that equity courts are bound by statutory constraints no less than are law courts. *Hedges v. Dixon County,* 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893); *see Rees v. City of Watertown,* 86 U.S. (19 Wall.) 107, 122, 22 L.Ed. 72 (1873) ("[a] court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law, or even without the authority of law"). As Story tells us, equity is "compelled to stop where the letter of the law stops." *See* 1 J. Story, *supra,* at 16. The letter of the law here precludes the panel's result in two important respects, neither of which the panel even considers.

*First,* the panel grants citizenship to petitioners who do not in fact meet the statutory criteria because they did not file their petition in a timely fashion. But it is crystal clear that the federal courts have no power whatsoever to disregard statutory naturalization requirements. In language that brooks no exceptions, the Supreme Court has stated: " 'Once it has been determined that a person does not qualify for citizenship, ... the district court has no discretion to ignore the defect and grant citizenship.' " *Fedorenko,* 449 U.S. at 517, 101 S.Ct. at 752 (quoting opinion below, 597 F.2d at 954). *Fedorenko*'s rationale conclusively forecloses the panel's result:

We repeat here what we said in one of these earlier cases:

"An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon the terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." *United States v. Ginsberg,* 243 U.S., at 474–75 [37 S.Ct. at 425].

See *Maney v. United States,* 278 U.S., at 22–23 [49 S.Ct. at 15–16]; *Johannessen v. United States,* 225 U.S., at 241–42 [32 S.Ct. at 616–17].

449 U.S. at 518, 101 S.Ct. at 753.

The panel was obviously familiar with *Fedorenko*, having cited it, albeit for a different proposition. *See* p. 1452 *supra*. But its opinion does not consider or address this language in *Fedorenko* which summarizes the Supreme Court's holding in that case. If *Fedorenko* can be distinguished, the panel fails to do so, apparently relying on its equity powers to shrug off a categorical directive from the Supreme Court. But it does not, in my view, serve the orderly development of law in this circuit to deny apparently controlling Supreme Court authority so much as a nod of acknowledgment.

*Second*, the panel trips lightly over the question of how a court, whether sitting in law or equity, can breathe life into a statute 40 years dead. Under what circumstances a court may disregard time limits set by Congress is a question frequently confronted by the courts; it is the subject of a substantial and well established body of law. There is, I think, a very persuasive argument that the Act's December 31, 1946, cutoff date is jurisdictional. Courts have no general power to entertain naturalization petitions; they must act pursuant to a specific grant of congressional authority. Because petitioners cannot qualify for, and do not seek relief under, the current immigration act, 796 F.2d at 1096, the court's jurisdiction must be based, if it exists at all, on the 1940 Act. That Act, however, provides that naturalization petitions "shall be filed no later than" December 31, 1946. 1940 Act § 701. If the deadline petitioners missed is jurisdictional, that is the end of the matter and neither law nor equity can revive their claim. *See McIntyre v. United States*, 789 F.2d 1408, 1411 (9th Cir.1986) (equity has no power to estop or toll a statutory time limit which is jurisdictional); *Burns v. United States*, 764 F.2d 722, 724 (9th Cir.1985) (same).

On the other hand, a plausible argument could be made that the December 31, 1946, cutoff date is more akin to a statute of limitations. But statutes of limitations are tolled against the United States only under certain very limited circumstances, normally premised on some act of affirmative misconduct by government officials. *See, e.g., Gibson v. United States*, 781 F.2d 1334, 1344–45 (9th Cir.1986) (Norris, J.) (fraudulent concealment), *cert. denied,* —— U.S. ——, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987); *Hyatt v. Heckler*, 807 F.2d 376 (4th Cir.1986) ("clandestine policy" to prevent plaintiffs from learning that their rights were violated). The Supreme Court's determination in *Hibi* that the government did not engage in affirmative misconduct, 414 U.S. at 8–9, 94 S.Ct. at 21–22, decisively forecloses this as a basis for tolling.

Whether the December 31, 1946, cutoff date is a jurisdictional provision or a statute of limitations, therefore, makes no difference; there appears to be no basis for disregarding it. Far more troubling, the principles that govern this area of law, and the limited exceptions conceivably available, are nowhere addressed in the panel's opinion. Instead, the panel cuts a swath through the entire field, ignoring authorities it apparently cannot distinguish. If equity empowers a court to do this, no principle of law is safe from judges bent on reaching a result they deem just.[1]

This, in my view, is the most pernicious aspect of the panel's opinion. By invoking the powers of equity, on a highly tenuous basis I would submit, the panel has freed itself of the need to even consider the controlling legal principles that bear on the issue. If a federal court can so easily sidestep precedent, including explicit directives from the Supreme Court, every federal judge becomes a law unto himself

---

1. Unbridled equitable power has been viewed with some trepidation since the earliest days of the Republic:

> It is a very dangerous thing to vest in the same judge power to decide on the law, and also general powers in equity; for if the law restrain him, he is only to step into his shoes

of equity, and give what judgment his reason or opinion may dictate....

The Federal Farmer, Letter III (Oct. 10, 1787), in 2 *The Complete Anti-Federalist* 244 (H. Storing ed. 1981). I would have thought that two centuries of fine tuning had put these concerns behind us.

and cases will turn entirely on who happens to be hearing them.

In the final analysis, the panel's action is based on its conclusion that it has identified a problem and that it alone can provide an effective remedy. 796 F.2d at 1103.[2] But whether a court is sitting in law or equity, identifying a problem that needs a solution is just not enough; the court must first have authority to act. As another panel of this court recently noted, "[t]he commission of a federal judge is not a 'general assignment to go about doing good.' " *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986) (quoting *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir.1978)). The panel here apparently disagrees.

### Conclusion

This is the third attempt by a panel of this court to confer citizenship upon Filipino veterans under the long-expired 1940 Act. The two prior attempts were rebuffed by the Supreme Court, once summarily. *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *Hibi*, 414 U.S. 5, 94 S.Ct. 19. The Second Circuit's approach in *Olegario* is well-reasoned, comports with the language of the statute and accords proper deference to the decision of a coordinate branch of our government taken 40 years ago in the area of foreign relations, uniquely within the province of the executive. The panel's opinion effectively overrules *Olegario* since no knowledgeable petitioner will pursue citizenship in the Second Circuit in lieu of the

Ninth. Moreover, the opinion cannot be squared with the Supreme Court's pronouncements in *Hibi* and *Fedorenko*, stretches the court's equity powers far beyond previously accepted limits, and calls into question established principles as to congressionally mandated time limitations. These, it seems to me, are ample reasons for taking the case en banc, vacating the panel's opinion and affirming the judgment of the district court.

---

2. When the opinion asserts that "[t]here is simply no other way to restore the lost opportunity for citizenship that Congress offered [petitioners] as a just reward for their military service in World War II," 796 F.2d at 1103, it overstates the point and does so in a way that denigrates the function and authority of Congress and the executive. The fact of the matter is that Congress has taken up this issue and, so far at least, has refused to grant relief. In the second session of the 98th Congress, Representative Dymally introduced two bills (H.R. 4895, 98th Cong., 2d Sess. (1984) and H.R. 5875, 98th Cong., 2d Sess. (1984)) designed to extend naturalization rights to Filipino veterans despite the statutory deadline. Both bills died in committee.

When our coordinate branches of government have considered the matter and refused to provide a remedy, it seems to me that the justification for judicial intervention is, applying Justice Jackson's aphorism, "at its lowest ebb." By granting applicants the relief they seek, the court has short-circuited the political process, pretermitting the actions and intentions of those in Congress and the executive who have considered and may wish to continue considering the problem. While this may be proper when the court determines that actions of Congress or the executive violate the Constitution, it is a far more difficult question where, as here, the court is relying entirely on inherent equitable powers. The availability of a solution through the political process, at the very least, lessens the justification for extraordinary judicial relief.